# In re Estate of Cheryl Peters
# (Carroll Peters, Appellant)

[765 A.2d 468]

Nos. 99-154 & 99-258

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed October 20, 2000

Motion for Reargument Denied November 28, 2000

*Kurt M. Hughes* of *Murdoch & Hughes*, Burlington, for Plaintiff-Appellee.

*Charles S. Martin* of *Martin & Associates*, Barre, for Defendant-Appellant.

**Amestoy, C.J.** Defendant Carroll Peters appeals from a Lamoille Superior Court jury verdict for plaintiff in a civil action for a sexual battery he allegedly committed against Cheryl Peters. Defendant raises six arguments on appeal: (1) the action is barred by the statute of limitations; (2) in a tort action for battery between spouses, a finding that consent to sexual intercourse has been withdrawn is a prerequisite to liability; (3) the trial court erred by allowing out-of-court statements made by Mrs. Peters, the deceased victim, to be admitted; (4) the compensatory damages are excessive; (5) the trial court erred in submitting the issue of punitive damages to the jury without first allowing defendant to disclose his lack of wealth; and (6) the trial court erred in awarding attorney's fees without any evidence to support the award. We affirm.

The following evidence was introduced at trial. Defendant and Cheryl Peters were married on July 13, 1990 and lived together in Hyde Park, Vermont. Mrs. Peters had several children who were not related to defendant. The Peters began having marital problems, and in January 1993 separated. Mrs. Peters moved in with her daughter, Raemarie Lamare, who lived in Morrisville. Several months later, in the summer of 1993, Mrs. Peters rented a house in Morrisville with her cousin, Richard Fitzgerald. In July of that year, Mrs. Peters quit-claimed her rights to the Hyde Park house. Defendant filed for divorce on August 4, 1993, and Mrs. Peters accepted service of the divorce papers.

On Sunday, August 8, 1993, defendant arrived at Mrs. Peters' residence in Morrisville at approximately 9:00 p.m. Mrs. Peters was

not there. Nicole Deuso, Ms. Peters' daughter, was there. Ms. Deuso testified that she and her boyfriend, Bryant Pierce, asked defendant to leave several times, but that he refused, and remained in the living room reading letters and poems he had written for Mrs. Peters. Eventually, Ms. Deuso turned out the lights in the living room to go to sleep, and defendant went into Mrs. Peters' bedroom.

According to Ms. Deuso, Mrs. Peters arrived home that morning at about 1:30 a.m., intoxicated. Ms. Deuso told her that defendant was in her bedroom, so Mrs. Peters went into her cousin's unoccupied bedroom. Defendant followed Mrs. Peters into the bedroom and then throughout the house as Mrs. Peters attempted to evade him, screaming "[i]t's my house!" Eventually, Mrs. Peters went into her bedroom, and defendant followed. According to Ms. Deuso, she told him, "[i]f you're going to be here, then just shut up and let me get some sleep."

The next morning Ms. Deuso heard Mrs. Peters ask defendant what he was doing there. She saw Mrs. Peters come out of the bedroom in the same dress she had worn the night before and go into the bathroom to get dressed for work. Defendant then came out of the bedroom in his t-shirt and underwear. Mr. Fitzgerald arrived home that morning. He testified that he was surprised to see defendant there, and felt that something was wrong.

At approximately 10:00 a.m. on Tuesday morning, August 10th, defendant visited Mrs. Peters' daughter, Ms. Lamare, at her apartment. Ms. Lamare testified that defendant told her that he "violated [her] mother" when he had gone to her house "the other night." Ms. Lamare recounted that defendant explained that when Mrs. Peters was passed out, he crawled into the bed and "made her accessible to him," and that he "couldn't get it in very far, but it was good for him and that he ejaculated." Defendant then asked Ms. Lamare whether he should call Mrs. Peters at work before she received a letter he had sent to her, confessing to what he had done. Ms. Lamare suggested that he call Mrs. Peters before she received his letter. Ms. Lamare told defendant that she hoped her mother "nailed his ass to the wall" for what he had done, to which defendant responded, "I'll do anything I can to get away with it."

Around 1:00 p.m. that same day, Mrs. Peters arrived at Ms. Lamare's apartment. Ms. Lamare testified that she could tell that something was wrong as soon as she saw her mother, and that Mrs. Peters immediately informed her that defendant had called her at work and told her that he had "violated" her. She stated that Mrs.

Peters was "devastated," and cried repeatedly, "I can't believe he raped me" as she rocked back and forth on the couch. Ms. Lamare encouraged her mother to call the police, but Mrs. Peters responded that she "didn't dare" to report the incident.

The next day, Mrs. Peters returned to Ms. Lamare's house with defendant's letter in which he confessed to the assault. The letter states, "I took advantage of you without your permission— sorry . . . ." The letter, which was admitted into evidence and read into the record by Ms. Lamare, graphically described the incident and defendant's explanation for his conduct. In the weeks that followed, defendant continually called and sent letters to Mrs. Peters. Ms. Lamare testified that her mother was frightened and hurt, and that her foremost concern "was to go where she couldn't be found."

Linda Briggs, Mrs. Peters' co-worker, testified that she had a conversation with Mrs. Peters "on a day in August of 1993," but did not specify the date. She noticed Mrs. Peters was upset and acting differently, and that her emotional state interfered with her work. When Ms. Briggs asked Mrs. Peters what was wrong, she responded that defendant "broke into [her] house the other night and raped [her]."

Mrs. Peters' cousin and roommate, Mr. Fitzgerald, testified that he met Mrs. Peters at the V.F.W. club to find out what had been bothering her when he saw her at their house on the morning at issue. She told Mr. Fitzgerald that defendant had raped her "the other morning." She stated that she did not want to get the police involved because she was scared, and that she was going to move out of town. Mr. Fitzgerald testified that Mrs. Peters was scared as she discussed this with him. However, he could not recall whether this conversation occurred on the evening of the early-morning assault or on the evening immediately after.

A few weeks later, Mrs. Peters went to the home of another of her daughters, Tina Teale, to borrow a truck for her move to Montpelier the following week. Ms. Teale testified that her mother was visibly upset and told Tina that defendant had raped her. Mrs. Peters showed Ms. Teale defendant's confession letter.

Mrs. Peters died on September 2, 1993, as a result of an unsolved homicide in the Morrisville home she shared with Mr. Fitzgerald. On June 10, 1996, Mrs. Peters' five children and her estate filed a complaint against defendant alleging wrongful death, sexual assault and battery. Defendant filed an answer and affirmative defenses on July 10, 1996. On July 31, 1996, defendant filed a motion to dismiss for

failure to state a claim, arguing that the wrongful death claim was barred by the statute of limitations, and that the sexual assault and battery claim did not allege a tort recognized by Vermont common or statutory law. The trial court dismissed the wrongful death claim because it was time-barred, but denied defendant's motion to dismiss the assault and battery claim. The estate was the only remaining plaintiff.

A three-day jury trial began on November 23, 1998. The above-mentioned witnesses testified, and several letters written by defendant, including the confession letter, were entered into evidence. Defendant's sole witness was a urologist whose testimony was limited to defendant's sexual capabilities. At the close of plaintiff's case, defendant moved for a directed verdict. In denying defendant's motion, the court stated, "I think the evidence is overwhelming, and this jury, if it believes the witnesses, would be well justified in finding that there was involuntary sexual intercourse, and that that amounted to a battery . . . ."

After the charge conference and at the close of both parties' evidence, the court gave the jury instructions. Defendant objected to the charge on punitive damages, arguing that the trial should have been bifurcated on this issue because defendant had not been given an opportunity to present his financial status. The court denied the objection, noting that defendant had not raised this issue at the charge conference, and that defendant was absent from a majority of the trial. After deliberations, the jury returned a verdict for plaintiff of $125,000 in compensatory damages and $480,000 in punitive damages. Defendant moved for judgment notwithstanding the verdict and for a new trial. The court denied the motion and entered judgment on the verdict. This appeal followed.

I.

Defendant first argues that plaintiff's battery claim is barred because it was not brought within the two-year statute of limitations for survival actions. See 12 V.S.A. § 557(a). Plaintiff implicitly concedes the applicability of the limitation, but contends that the statute of limitations has been waived in this case by defendant's failure to assert it. We agree that defendant has not preserved a statute of limitations defense to plaintiff's battery claim.

Letters of administration memorializing Mrs. Peters' death were issued on September 10, 1993. Plaintiff's complaint alleging that defendant "committed a sexual assault and battery" on decedent

(Count I), and did "willfully, deliberately and with premeditation kill . . . decedent" (Count II), was filed on June 10, 1996. Defendant filed a motion to dismiss, asserting that Count II should be dismissed because of plaintiff's failure to bring an action for wrongful death within two years, as required by 14 V.S.A. § 1492(a). Notably, defendant made no assertion that Count I was barred by 12 V.S.A. § 557(a) nor any other limitation, but argued instead that Count I "[did] not allege a tort recognized by the common or statutory law of the State of Vermont." Defendant's subsequent memorandum of law in support of his motion to dismiss reiterated at length his argument that Count II was barred by § 1492(a), but again failed to assert any statute of limitations defense to Count I. The trial court dismissed Count II, concluding that it was barred by § 1492(a).[1] Defendant's motion to dismiss Count I on the grounds that the facts alleged did not state a cause of action was denied.

 "[I]n Vermont, a statute of limitations is an affirmative defense that provides repose for a prospective defendant, and its expiration does not affect a court's jurisdiction to hear the case." *Hixson v. Plump*, 167 Vt. 202, 206, 704 A.2d 1159, 1162 (1997). The primary purpose of a limitations period is fairness to a defendant. See *id.* (citing *Duffy v. Horton Mem. Hosp.*, 488 N.E.2d 820, 822 (N.Y. 1985)). Failure to plead statute of limitations as an affirmative defense in an answer or appropriate motion means that it is waived. See *id.* (citing *In re Augenblick*, 488 N.E.2d 109, 110 (N.Y. 1985); V.R.C.P. 8(c)). Defendant's contention on appeal that he asserted the statute of limitations in his answer, and requested the trial court to dismiss both counts on the basis of a statute of limitations defense, is not supported by the record. Although defendant included "[s]tatute of [l]imitations" in a list of seven "affirmative defenses" set forth in his answer, the statute he now relies upon, 12 V.S.A. § 557(a), was never asserted below. The bare assertion of an intention to raise the statute of limitations is insufficient to preserve the defense where, as here, defendant failed to identify either the statute of limitations upon which he relied or the count to which it applied.

---

[1] The trial court rejected plaintiff's contention that a 1996 amendment to § 1492 extending, under certain circumstances, the statute of limitations for wrongful death claims to seven years should be applied retroactively. The trial court's decision was not appealed.

## II.

■ Defendant next argues that consent to sexual contact must be presumed in a tort action for sexual battery between spouses. To support this assertion, defendant cites arcane common law upholding the implied consent by a married woman to sexual intercourse. Defendant contends that courts have rejected implied marital consent as a defense to rape only in those cases where a separation decree has been issued, or where violence or force was used to achieve sexual contact.

We reject entirely the notion that marriage creates any kind of implied "blanket consent to sexual contact." The distinction between marital and nonmarital criminal rape is based on archaic "common-law doctrines that a woman was the property of her husband." *People v. Liberta*, 474 N.E.2d 567, 573 (N.Y. 1984). "A married woman has the same right to control her own body as does an unmarried woman." *Id.*

■ Defendant's recommendation that we adopt a bar to any civil action for sexual battery between spouses who are not under a separation order, unless the withdrawal of consent prior to the sexual contact is "clear and unambiguous," is without basis in the law. Marital status makes no difference under Vermont's criminal provision for sexual assault. See 13 V.S.A. § 3252.[2] In fact, § 3252 was specifically amended in 1985 to remove the exemption for those who commit sexual assaults against their spouses, see 1985, No. 83, § 2, and now expressly prohibits the compulsion of another person to engage in a sexual act without the other person's consent, regardless of the marital status between the parties. See *id.* § 3252(a)(1)(A), (a)(3).

Moreover, defendant's arguments that his proposed rule prevents governmental intrusion into marital privacy and promotes reconciliation of the spouses are unpersuasive. As the court stated in *Liberta*:

> [T]here is no rational relation between allowing a husband to forcibly rape his wife and these interests. The marital exemption simply does not further marital privacy because this right of privacy protects consensual acts, not violent sexual assaults. Just as a husband cannot invoke a right of marital privacy to escape liability for beating his wife, he cannot justifiably rape his wife under the guise of a right to privacy.

---

[2] Section 3252(a)(3) excepts from the sexual assault provisions consensual sexual acts between married persons where one is under the age of 16.

*Liberta,* 474 N.E.2d at 574. Defendant's reconciliation rationale is similarly flawed. In this case, there is extensive evidence indicating that Mrs. Peters continually rejected defendant's attempts at reconciliation: she quit-claimed her rights on the Hyde Park home, signed the divorce papers when they were served, entered into a relationship with another person, and made plans to move to another town.

■ The jury reasonably concluded that plaintiff proved intentional battery.[3] "A bodily contact is offensive if it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19 (1965); see also *Rogers v. Bigelow,* 90 Vt. 41, 46, 96 A. 417, 419 (1916) ("It is very generally held that in actions for intentional wrongs, such as trespass for assault and battery, damages are recoverable for mental suffering consisting in a sense of insult, indignity, humiliation or injury to the feelings."). In the instant case, the testimony of Ms. Lamare, Mr. Fitzgerald, Ms. Briggs, and Ms. Teale presented significant evidence to the jury that Mrs. Peters was greatly upset by the sexual battery. Defendant's statement in his letter that he "took advantage" of Mrs. Peters "without [her] permission" constitutes significant evidence to support the jury's verdict on the battery claim. The evidence of bodily contact inflicted upon Mrs. Peters without her consent is more than sufficient to offend a reasonable sense of personal dignity. See Restatement (Second) of Torts § 18 cmt. d, illus. 2 ("A kisses B while asleep but does not waken or harm her. A is subject to liability to B."). We will not disturb the jury's verdict that Mrs. Peters suffered such injury.

### III.

Defendant next contends—without specifically identifying the statements to which he objects or, indeed, the witnesses who made them—that the admission of testimony violated the prohibition against hearsay under V.R.E. 802. Defendant's blanket claim of error asserts that the trial court abused its discretion in admitting testimony of Mrs. Peters' reaction to learning of the battery.[4]

---

[3] Although plaintiff's complaint alleged both assault and battery, the court charged only on battery, and instructed the jury that in order to find defendant liable, plaintiff had to demonstrate that Mrs. Peters did not consent to the offensive contact.

[4] Defendant's brief states only that the defendant "objected to the hearsay statements of Mrs. Peters as recounted by her daughter, her cousin and her co-worker." Defendant, as we note below, failed to preserve his claim of error as to Mr. Fitzgerald, the decedent's cousin. Two of the decedent's daughters, Ms. Lamare and Ms. Teale,

## 1. Testimony of Mr. Fitzgerald

At the outset, we agree with the trial court's observation that defendant failed to object to the hearsay testimony of Mr. Fitzgerald. Defendant raised hearsay objections during the testimony of Ms. Briggs and Ms. Lamare, but did not do so when Mr. Fitzgerald testified following these two witnesses. Defendant argues that his "continuing objection" to all hearsay statements introduced by plaintiff's witnesses regarding Mrs. Peters' reaction to learning of the sexual battery preserved his claim of error regarding Mr. Fitzgerald's testimony. We disagree.

 In order to preserve a claim of error in the introduction of evidence, the party opposing the introduction must make "a timely objection or motion to strike." V.R.E. 103(a)(1). This means that "[t]he objection must have been made at the time the evidence was offered or the question was asked." *State v. Fisher*, 167 Vt. 36, 43, 702 A.2d 41, 45 (1997). Ordinarily it must be made when the grounds become apparent. 1 K.S. Broun, et al., McCormick on Evidence § 52, at 200-01 (J.W. Strong ed., 4th ed. 1992). Neither V.R.C.P. 46, nor relevant case law on the necessity of subsequent objections to the same legal concern, can be reasonably construed to allow a continuing objection as open ended as defendant seeks here. An objection must be entered, at the very least, each time a new witness testifies, even if the objection is on the same grounds as a continuing objection to the testimony of a prior witness or witnesses. The purpose of requiring a timely objection is to bring the error to the attention of the trial court so that the court may have "an opportunity to rule." *State v. Chambers*, 144 Vt. 234, 242, 477 A.2d 110, 114 (1984). Where the aggrieved party fails to make a "'specific objection, including a clear statement of the matter to which he objects and the grounds of the objection'" at trial, the issue is not preserved for consideration on appeal. *Deyo v. Kinley*, 152 Vt. 196, 200, 565 A.2d 1286, 1289 (1989) (quoting *State v. Lettieri*, 149 Vt. 340, 342, 543 A.2d 683, 685 (1988)). Defendant did not meet his burden to note his "specific objection" to Mr. Fitzgerald's testimony. See *id.*

---

testified, as did Mrs. Peters' co-worker, Ms. Briggs. Defendant failed to object specifically on hearsay grounds to the testimony of Ms. Teale. Defendant's claim of error on appeal as to hearsay statements of Mrs. Peters "as recounted by her daughter" presumably refers to the testimony of Ms. Lamare.

## 2. Testimony of Ms. Lamare and Ms. Briggs

■ With respect to the testimony of Ms. Lamare and Ms. Briggs, defendant contends the trial court erred in admitting hearsay statements of Mrs. Peters under the "excited utterance" exception to the hearsay rule. See V.R.E. 803(2). Defendant contends that the "excited utterance" exception to the hearsay rule must be construed to relate only to the "underlying" startling event or condition. Defendant reasons that because the admitted hearsay statements were uttered upon learning of the battery, rather than upon the event of the battery, the declarant could not, as a matter of law, be "under the stress of excitement caused by the event or condition." *Id.*

The "excited utterance" exception to the hearsay rule under V.R.E. 803(2) is characterized by: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." There are two essential requirements for the excited utterance exception: (1) a startling event or condition, and (2) a spontaneous utterance in reaction to the event or condition made under the stress of excitement and not as a result of reflective thought. See *State v. Solomon*, 144 Vt. 269, 272, 476 A.2d 122, 124 (1984). The underlying rationale for the exception lies in the assumption that a person's powers of reflection and fabrication will be suspended when she is subject to the excitement of a startling event, and any utterances she makes will be spontaneous and trustworthy. See *id.*; *State v. Ayers*, 148 Vt. 421, 424, 535 A.2d 330, 332 (1987).

We have previously rejected the argument that a declarant's excited utterance under V.R.E. 803(2) must be contemporaneous with a sexual assault. See *State v. Shaw*, 149 Vt. 275, 281, 542 A.2d 1106, 1109 (1987) ("contemporaneousness with the exciting event is not required for statements to be admissible as excited utterances"); *State v. Longe*, 133 Vt. 624, 626, 349 A.2d 232, 234 (1975) ("modern legal thinking is that the term 'contemporaneous' is not used in a completely restrictive sense, but rather in a broadly descriptive one"). In *Shaw*, we noted "the key consideration is the condition of the declarant." *Shaw*, 149 Vt. at 281, 542 A.2d at 1109. "Rule 803(2), relies [for trustworthiness] on the exciting quality of the event. The statement must thus have been made while the declarant's state of excitement continued, on the theory that his mental condition prevents fabrication." Reporter's Notes, V.R.E. 803.

■ The relevant inquiry is whether Ms. Peters' statements were made while she was in a "highly excited, agitated state" sufficient to

suspend her powers of reflection and fabrication. *Shaw*, 149 Vt. at 281, 542 A.2d at 1109. Ms. Lamare's testimony established that there was, at most, a three-hour gap between the time defendant called Mrs. Peters to inform her that he had violated her, and the time Mrs. Peters arrived at her daughter's apartment. Ms. Lamare's testimony that Mrs. Peters was visibly upset, crying and rocking back and forth as she repeatedly said "I can't believe he raped me," supports the trial court's determination that the declarant was under the influence of the startling event. See *Ayers*, 148 Vt. at 424, 535 A.2d at 332 (trial courts have "wide discretion" to determine whether declarant was under the influence of the excited event). See also *United States v. Napier*, 518 F.2d 316, 317-18 (9th Cir. 1975) (admitting exclamation "He killed me, he killed me!" by kidnap victim hospitalized for seven weeks with head injuries, upon seeing newspaper picture of defendant for first time one week after returning home); *State v. Moats*, 457 N.W.2d 299, 309-10 (Wis. 1990) (admitting testimony offered by mother of five-year-old assault victim who learned about sexual assault on daughter one week afterward). Accordingly, Ms. Lamare's testimony regarding her exchange with Ms. Peters on August 10th was properly admitted.

▮ Ms. Lamare's testimony that, in the weeks that followed, Mrs. Peters told her that she was frightened by defendant and wanted to get away from him, was not admissible under the excited utterance exception. Although she was understandably still upset from learning of the battery, this conversation was too remote to fall within the exception. Similarly, Ms. Briggs' testimony that Mrs. Peters told her on a day in August 1993 that defendant had raped her "the other night" should not have been admitted under 803(2).[5]

▮ Although portions of Ms. Lamare's testimony, as well as the testimony of Ms. Briggs, were not admissible under the excited utterance exception, the trial court's error was harmless. See V.R.C.P. 61; *Imported Car Center, Inc. v. Billings*, 163 Vt. 76, 83, 653 A.2d 765, 770 (1994). Given the overwhelming, admissible evidence produced from witnesses Ms. Lamare, Mr. Fitzgerald and Ms. Teale, in addition to the critical fact that defendant admitted in writing to

---

[5] Appellee contends that this testimony, if inadmissible under the excited utterance exception, is admissible under the V.R.E. 803(3) hearsay exception as a statement of declarant's then existing mental, emotional or physical condition. It is unnecessary to reach this issue in light of our determination that admission of the testimony was harmless.

"[taking] advantage" of Mrs. Peters without her consent, the admission of the erroneous portion of Ms. Lamare's and Ms. Briggs' testimony did not affect the substantial rights of defendant nor cause manifest injustice. See *Imported Car Center*, 163 Vt. at 83, 653 A.2d at 770; *State v. Weller*, 162 Vt. 79, 84, 644 A.2d 839, 842 (1994).

## IV.

Defendant next argues that the jury's award of $125,000 in compensatory damages for the sexual battery is grossly excessive. "In evaluating this claim, we must consider the evidence in the light most favorable to the damages found by the jury and uphold the verdict if there was evidence reasonably supporting it." *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 144, 636 A.2d 744, 753 (1993) (citation omitted). "To overturn a jury award, an appellant must demonstrate that the verdict was entirely excessive . . . ." *Turgeon v. Schneider*, 150 Vt. 268, 272, 553 A.2d 548, 551 (1988) (internal quotations omitted).

Plaintiff sued defendant for battery to recover damages suffered by Mrs. Peters stemming from harmful and offensive bodily contact. Mrs. Peters' condition, as described by witnesses who testified regarding her reaction to learning of defendant's assault, constitutes the type of injury for which damages are recoverable in a sexual battery action. There was ample evidence for the jury to reasonably conclude that Mrs. Peters' estate was entitled to damages for her "mental suffering consisting in a sense of insult, indignity, humiliation or injury to the feelings." *Rogers*, 90 Vt. at 46, 96 A. at 419.

Defendant argues that the award's excessiveness is demonstrated simply by dividing $125,000 by the number of days before Mrs. Peters' death, which amounts to $7000 per day. We hesitate to attempt to place a per diem monetary value on a person's sense of dignity, as damages for such an injury are not capable of precise calculation. See *Imported Car Center*, 163 Vt. at 82, 653 A.2d at 770 (court will not interfere with an award of damages where exact computation is impossible). Calculating damages is the jury's duty, and considering Mrs. Peters' humiliation and emotional suffering, the size of the verdict alone does not show that the award was "entirely excessive." See *Turgeon*, 150 Vt. at 272, 553 A.2d at 551; *Lewis v. Gagne*, 123 Vt. 217, 221, 185 A.2d 468, 470-71 (1962) (trial court did not abuse its discretion denying motion to set aside verdict based on its size). Accordingly, the court properly denied defendant's motion to set aside or reduce the damage award.

## V

■■ Defendant next argues that the trial court erred in submitting the issue of punitive damages to the jury without providing defendant an opportunity to disclose his lack of wealth. He claims that "[d]uring pre-trial proceedings, the court specifically postponed disclosure of defendant's wealth until the jury returned a verdict for compensatory damages," and that, relying upon that ruling, he presented no evidence regarding his wealth during the trial. Following the court's instructions to the jury, defendant raised an objection to the charge on punitive damages, arguing that the trial should have been bifurcated on this issue because defendant had not been given an opportunity to present his financial status. The court noted that defendant did not raise his objection at the charge conference, and ruled that defendant's objection to the issue had been waived.

On appeal, defendant has failed to support his claim that he is entitled to rely on the trial court's discovery ruling that bifurcated the trial. First, defendant has not provided this Court with any record of the discovery ruling upon which he relies, nor has he provided us with citation to the record. Our review of the record shows no written order bifurcating the trial. Second, because we have no record of the ruling, it is unclear whether the court ruled that (1) defendant need not turn over financial information during discovery until the jury found compensatory damages, or (2) the trial was bifurcated and defendant need not turn over financial information until the jury finds compensatory damages. Given that defendant does not point to any motion to bifurcate the trial, and that the ruling appears to have been in response to plaintiff's request for financial information, we cannot assume that the court made other than a discovery ruling. As plaintiff never pursued the financial information, nor a bifurcated trial, plaintiff waived its right to obtain defendant's financial information. And finally, defendant failed to raise the issue of trial bifurcation or object to the instruction on punitive damages at the charge conference. He did not raise the issue until after the court instructed the jury. Thus, in addition to agreeing with the trial court that the issue was waived at trial by failing to raise it in a timely fashion, defendant has failed to provide an adequte record for us to consider the issue on appeal. See V.R.A.P. 10 (appellant required to order transcription of all parts of proceedings relevant to any issue being raised by appellant on appeal).

## VI.

 Defendant's final argument is that the court erred in awarding attorney fees of $650.00 to plaintiff without any evidence to support the award. The court ordered these fees to cover, among other things, travel time to and from Hyde Park, and the legal research, dictation and preparation time required to oppose defendant's motion to dissolve, modify, and discharge issuance of a trustee process on defendant's corporation. "When an award of attorney's fees is not supported by the evidence, it cannot stand, *unless the award is not large* and can be calculated in light of a court's experience and knowledge." *Hodgeman v. Jard Co.*, 157 Vt. 461, 466, 599 A.2d 1371, 1374 (1991) (emphasis added) (citations omitted). The amount awarded here was not as large, either in proportion to the damage award or in total amount, as those we have allowed in other cases. See *id.* at 463, 599 A.2d at 1372 (twenty percent of award, up to $3,000); *Gokey v. Bessette*, 154 Vt. 560, 567, 580 A.2d 488, 493 (1990) ($700 in fees on award of $5000). The court did not abuse its discretion in awarding the fees.

*Affirmed.*