## State of Vermont v. Vincent Muscari

[807 A.2d 407]

No. 00-562

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed July 5, 2002

*Dan M. Davis*, Windham County State's Attorney, and *Christopher C. Moll* and *Tracy Kelly Shriver*, Deputy State's Attorneys, Brattleboro, for Plaintiff-Appellee.

*William E. Kraham*, Brattleboro, for Defendant-Appellant.

**Johnson, J.** Defendant appeals his convictions for unlawful trespass, first degree aggravated domestic assault, simple assault by mutual combat, and unlawful mischief. Defendant contends the trial court erred by: (1) permitting a charge of aggravated domestic assault; (2) admitting the tape of the victim's 911 call in evidence; (3) erroneously instructing the jury on serious bodily injury and the relevance of expert medical testimony; (4) considering defendant's silence to the presentence investigator at sentencing; (5) denying him equal access to the crime scene; (6) engaging in experimental trial procedures; (7) denying him the right of confrontation by limiting the scope of cross-examination of the victim; and (8) improperly admitting evidence of prior bad acts. We affirm.

On the evening of February 5, 1999 defendant let himself into the Westminister, Vermont home of his former girlfriend, Ellyn Benson, and went up the stairs to her bedroom where he discovered Ms. Benson with her boyfriend, Chad Simpson. Defendant claimed that he and Ms. Benson had scheduled a date to have dinner at her residence that night. Defendant and Ms. Benson came face to face at Ms. Benson's bedroom door and began to argue. When defendant pushed Ms. Benson down to the floor, Mr. Simpson intervened, and the two men fought. After Mr. Simpson and defendant temporarily stopped fighting, all three individuals went downstairs to the living room and kitchen. While it is disputed whether defendant accompanied or dragged Ms. Benson down the stairs, the evidence at trial indicated that shortly after Ms. Benson arrived downstairs, defendant punched her in the face. After being hit, Ms. Benson tried to defuse the situation by urging Mr. Simpson to leave. With Mr. Simpson's departure, however, defendant's violent behavior escalated; he smashed Ms. Benson's plates and other breakables, threw them into

the air, and hit Ms. Benson in the face with at least one broken piece of dishware. Defendant then punched Ms. Benson in the face again.

Ms. Benson ran outside to escape. Mr. Simpson, who was in the process of leaving, saw that Ms. Benson was bleeding from her cheek and returned to the scene to physically engage defendant. As the two men fought, Ms. Benson called 911. She spoke with the 911 operator, left the telephone line open, and went back outside. Defendant fled the scene before the police arrived. Several hours later, from the house of his attorney, defendant surrendered himself to the police.

The 911 response team administered first aid and photographed Ms. Benson's injuries before taking her to the hospital for further treatment. The police took photographs of the crime scene and interviewed Ms. Benson the night of February 5th, and again the following day. Although the defense wanted to take its own photographs, Ms. Benson would not allow them into her home. Ms. Benson's injuries as documented by the police photographs and affidavit, and by Ms. Benson's testimony at trial, consisted of a black eye, a three-centimeter long and one-centimeter deep laceration on her face that required stitches, an additional small laceration to the forehead, numerous small bruises and superficial abrasions, and back pain. The larger laceration has developed into a permanent scar and the back pain continues.

Defendant was charged with unlawful trespass, first degree aggravated domestic assault, simple assault by mutual combat, and unlawful mischief. After a three-day trial, on June 30, 2000, a jury convicted defendant of all counts. Defendant appeals, alleging several different errors at trial.

Defendant's first claim of error is that there was insufficient evidence to support a finding of serious bodily injury, and thus the charge of aggravated assault. Defendant brought motions for judgment of acquittal under V.R.Cr.P. 29 at the close of the State's case and after trial. The court denied both motions. On review of a court's denial of a motion for judgment of acquittal we must consider "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State v. Couture*, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999) (internal quotations omitted). We conclude that there was sufficient evidence that the victim suffered serious bodily injury.

■ Title 13 V.S.A. § 1021(2) defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes substantial loss or impairment of the function of any bodily member or organ or substantial impairment of health, or substantial disfigurement." The term "substantial loss" replaced "serious, permanent disfigurement, or protracted loss" and "substantial disfigurement" was added when the Legislature amended the aggravated assault statute in 1993. Compare 1993, No. 95, § 3, with 1971, No. 222 (Adj. Sess.), § 1. Our primary objective in construing a statute is to give effect to the legislative intent. *State v. Read,* 165 Vt. 141, 147, 680 A.2d 944, 948 (1996). We deduce from the amendment that the Legislature intended that a conviction for aggravated assault can now be sustained on evidence of "substantial disfigurement" that need not be "serious, permanent disfigurement." See *Jones v. Dep't of Employment Sec.,* 140 Vt. 552, 555, 442 A.2d 463, 464 (1982) (amendment of statute shows legislative intent to change effect of existing law).

■ In this case, the evidence showed that the victim sustained a black eye, numerous bruises and abrasions, injury to her back, and two facial lacerations — one resulting in a permanent scar. Although the permanent facial scar was not perceivable by the jury from across the courtroom, and the other injuries were temporary, the evidence was sufficient for the jury to conclude the victim sustained "substantial disfigurement." Neither visibility from a distance nor permanency are requisite to substantial disfigurement. See *State v. Carlson,* 369 N.W.2d 326, 327-28 (Minn. Ct. App. 1985) (two black eyes, facial bruises, bruises on neck and head, and scratches on arm were sufficient for jury to conclude victim sustained substantial bodily harm); *State v. Ashcraft,* 859 P.2d 60, 66 (Wash. Ct. App. 1993) (bruises and bite mark show "temporary but substantial disfigurement"); see also *State v. Jennings,* No. CX-96-2093, 1997 WL 292162, at *1 (Minn. June 3, 1997) (holding that victim suffered "substantial bodily harm" from "temporary but substantial disfigurement" resulting from "swelling and a cut in the area of the right eye that required six stitches").

■ Defendant further argues that the jury's determination of substantial disfigurement should have been supported by expert medical testimony. Whether a proof of an element of a crime meets the standard of "substantial," however, is not a medical determination but is a question of fact for the jury. *State v. Blakeney,* 137 Vt. 495, 500,

408 A.2d 636, 640 (1979). Indeed, the jury is free to make this determination even in the absence of medical testimony. See *State v. Sorrell*, 152 Vt. 543, 547, 568 A.2d 376, 378 (1989) (holding that medical testimony was not necessary for a jury to determine whether the defendant's choking of the victim put her in "substantial danger of death"). In this case both the emergency room doctor and the victim's personal physician testified to the extent of victim's injuries. The jury viewed the scar and was shown photographs of the temporary injuries. This evidence provided ample support for the jury's guilty verdict on the aggravated assault charge. That the physicians chose not to characterize the disfiguring injuries as "substantial" is of no consequence.

Defendant's second claim is that the trial court erred in admitting a recording of the 911 telephone call the victim placed during the incident. Defendant claims that the tape, which was played for the jury several times, was not properly authenticated, was not the best evidence, and contained inadmissible hearsay evidence. A trial court's evidentiary rulings are left to its sound discretion, and we will not reverse absent an abuse of that discretion. *State v. Corliss*, 168 Vt. 333, 337, 721 A.2d 438, 442 (1998).

A tape recording is authenticated for admissibility "by evidence sufficient to support a finding that the matter in question is what its proponent claims." V.R.E. 901(a). In this case, the State could authenticate the recording by "[i]dentification of a voice, . . . by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." *Id.* 901(b)(5). "The identification and authentication of the tapes is an issue to be ruled upon by the trial court on the basis of relevance and reasonable certainty." *State v. Mecier*, 138 Vt. 149, 152, 412 A.2d 291, 294 (1980). At trial, the court held a foundational hearing out of the presence of the jury in which the victim identified her own voice on the 911 tape. The court ruled that this identification was sufficient to authenticate the tape.

In reviewing the trial court's decision, we note that the test for authenticating evidence is not a demanding one, and that some questions regarding a piece of evidence's origin or chain of custody are permissible. "The test for a foundation for admissibility is not absolute certainty. It only requires that the evidence be of demonstrable relevance and of sufficient meaningful substance to be justifiably relied upon as a fact by the jury, rather than an insubstantial invitation to conjecture." *Id.* at 152, 412 A.2d at 293 (internal quotations omitted).

In *Mecier*, we upheld the authentication of tapes made by a sheriff of telephone conversations with the defendant while he was barricaded in his house after shooting his wife and daughter. At trial, the sheriff testified that he was familiar with the defendant's voice and that the tapes were continuous despite several gaps within. We held that under these circumstances the tapes were identified with "reasonable certainty." *Id.* at 153, 412 A.2d at 294. Here, defendant points out that there are unexplained stops and starts in the tape, and that there are unidentified voices on the tape (i.e. the 911 operator). These aspects of the tape, however, do not diminish the relevance of the victim's statements made in the course of the attack, or cast any doubt on the victim's identification of the voice on the tape as her own. Similarly, although defendant highlights some circumstances that may give rise to doubts about the 911 tape, "the defects in proof here are such that a jury could have found the tapes believable for the accuracy of their contents beyond a reasonable doubt." *Id.*; see also *State v. Connarn*, 138 Vt. 270, 274-75, 413 A.2d 812, 815 (1980) ("The identity of the specimen need not be proved beyond a possibility of doubt, but the circumstances must be such as to establish a reasonable assurance of the identity of the specimen although all possibility of tampering is not excluded."). The tape was properly authenticated by the victim's identification of her own voice. Thus, the court did not err in admitting the tape.

██Defendant also objects to the admission of the tape on the grounds that there was no explanation offered as to why the original recording was not offered. In admitting the tape, the trial court did not determine whether the tape was the original or a duplicate. In this case, however, there is no need for the State to produce evidence that the tape played was the original, because whether it was the original or a duplicate is inconsequential in light of the fact that V.R.E. 1003 allows for the admission of duplicates. See *Mills v. Mills*, 167 Vt. 567, 568, 702 A.2d 79, 81 (1997) (mem.) (holding that "[t]he best-evidence rule did not require plaintiff to introduce the original tape, nor did it require plaintiff to show that the proffered tape was a duplicate"). V.R.E. 1003 states that duplicates are admissible to the same extent as an original unless there is a question as to the authenticity of the original or it would be prejudicial to admit a duplicate. As we held above, there is no question as to the authenticity of the original. Nor does defendant identify any prejudice that he would suffer if the tape admitted was a duplicate. Therefore, V.R.E. 1003's elements were met, and the tape was properly admitted.

■ Finally, defendant argues that the tape recordings, even if authentic, contain inadmissible hearsay evidence. The court ruled that the victim's statements, which were being admitted for their content, fell clearly within the excited utterance exception to the hearsay rule. V.R.E. 803(2). That rule allows "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" to be admitted despite the hearsay rule. *Id.* Given that the 911 telephone call was made while defendant's attack was ongoing, the court's conclusion that these statements were excited utterances, and therefore trustworthy, is reasonable. See *In re Estate of Peters*, 171 Vt. 381, 391, 765 A.2d 468, 476 (2000) ("rationale for [excited utterances] exception lies in the assumption that a person's powers of reflection and fabrication will be suspended when she is subject to the excitement of a startling event"). There was no error in admitting the 911 tape.

Defendant next argues that the court's instructions to the jury on "serious bodily injury" and regarding the expert medical testimony were erroneous. Defendant asserts that the court erred when it included only two of the four disjunctive elements of "serious bodily injury." Defendant also claims that the court's instruction diminished the value of the medical expert testimony regarding the victim's injuries, which undermined the defense's theory of the case. As discussed above, 13 V.S.A. § 1021(2) defines "serious bodily injury" as one of four elements: "bodily injury which creates a substantial risk of death *or* which causes substantial loss or impairment of the function of any bodily member or organ *or* substantial impairment of health, *or* substantial disfigurement" (emphasis added). The court instructed the jury on only two of these elements as follows: "serious bodily injury means any bodily injury which, in pertinent part, creates or causes at least one of the following two. One, a substantial impairment of health; or, two, substantial disfigurement." Defendant claims that by failing to instruct on the other two elements, namely "substantial risk of death" or "substantial loss . . . of the function of any bodily member or organ," 13 V.S.A. § 1021(2), the court relieved the State of part of its burden of proof on elements of the crime.

We must review the jury instructions in their entirety to determine whether they sufficiently guided the jury without a prejudicial impact on deliberations. *Couture*, 169 Vt. at 230, 734 A.2d at 530. Thus, the standard of review is whether the instructions taken as a whole breathe the true spirit of the law, such that the jury has not been misled. See *State v. Roy*, 151 Vt. 17, 24, 557 A.2d 884, 889 (1989). Even

if the instructions are not as well-worded as we or defendant might desire, we will not reverse a conviction for error in the instructions if that standard has been met. *State v. Dann*, 167 Vt. 119, 132, 702 A.2d 105, 113 (1997).

There was no error in the instructions. Section 1021(2)'s definition of "serious bodily injury" was written in the disjunctive, meaning that the State must prove only one of the elements to meet the definition, rather than all four. *State v. Carpenter*, 155 Vt. 59, 63, 580 A.2d 497, 500 (1990). In this case, there was no allegation that defendant's actions created a "substantial risk of death" or caused the substantial loss of function of a body part. These elements were never part of the State's case, and no evidence was presented that would have allowed a jury to conclude that these elements were met. To omit these elements of the definition from the instruction, therefore, was a valid decision designed to avoid confusing the jury. The trial court was not required to instruct the jury on all four disjunctive elements of "serious bodily injury" where there was no evidence to support two of those elements.

Defendant also complains that the trial court's instruction on the medical expert testimony undermined that testimony and encouraged the jurors to disregard it. The complained of instruction was as follows:

> You should distinctly understand that whether or not an expert has given an opinion about whether an element of any charged offense or claim existed, it remains your responsibility to determine whether such an element has been proven in this case. For example, you should not simply substitute the medical opinion of a doctor as to whether Ms. Benson suffered an injury which created substantial impairment of health or substantial disfigurement for your own judgment based upon all the evidence and the legal definitions of such terms which I will give you. Rather, you should consider the opinions and conclusions of any expert as you would any witness in the case and reach your own determinations in accordance with the facts you find from all the evidence and the law as I am now instructing you.

Defendant contends that this instruction harmed his case, because his defense at trial hinged largely on the medical testimony, which did not characterize the victim's injuries as "serious bodily injury."

The instruction was proper. The purpose of the instruction was to inform the jury that what is "serious bodily injury" is for the jury to decide, not anyone else. Although V.R.E. 704 allows an expert to testify as to the ultimate issue to be decided, that testimony is not entitled to any particular reverence. Rather it is the province of the jury to determine what weight to accord expert witness testimony. *Keus v. Brooks Drug, Inc.*, 163 Vt. 1, 5, 652 A.2d 475, 478 (1994). A doctor's conclusion about what is a serious bodily injury is a separate matter from what is a "serious bodily injury" according to 13 V.S.A. § 1021(2). Moreover, we have made clear that expert testimony may not be used to allow a witness to give legal conclusions. *Riess v. A.O. Smith Corp.*, 150 Vt. 527, 531, 556 A.2d 68, 72 (1988). Because of the possible prejudice that results from expert testimony regarding the ultimate issue to be decided, "careful instructions to the jury" are required. *Id.* at 532, 556 A.2d at 72. The court's instruction served precisely this cautionary function.

Defendant next claims that the trial court violated his privilege against self-incrimination by improperly considering his silence in the sentencing process as a basis to enhance his sentence. Upon advice of counsel, defendant remained silent at the interview conducted as part of the presentence investigation (PSI). Defendant asserts that the PSI was flawed because it contained impermissible inferences based on his silence, in that the investigator concluded that defendant showed no remorse for the crimes. After receiving the PSI, the trial court sentenced him to a term of two to six and one-half years in prison. Defendant argues the court erred by accepting the PSI, and by holding defendant's silence at the sentencing itself against him.

The first flaw in defendant's argument is his contention that the court's refusal to grant him probation in lieu of jail time is a sentence enhancement. We do not accept this characterization. The trial court's sentence was within the statutory guidelines for the crime for which he was convicted. See 13 V.S.A. § 1043(b) (first degree agravated domestic assault punishable by not more than fifteen years prison, or $25,000 or both). It is settled law that a trial court's denial of a sentence reduction does not constitute sentence enhancement. In *State v. Sims*, 158 Vt. 173, 189, 608 A.2d 1149, 1158 (1991), we stated that "[w]e are unprepared to equate the possibility of leniency with impermissible punishment. . . . If we were to characterize the denial of a reduction as a penalty, it would be to say that defendants who express genuine remorse for their actions can never be rewarded at sentencing." (internal citations omitted). That defendant was

112

sentenced to a prison term, rather than probation, is not an improper enhancement.

 Defendant's claim that the trial court erred by considering his silence at the PSI and the sentencing hearing is also without merit. Defendant cites the United States Supreme Court's decision in *Mitchell v. United States*, 526 U.S. 314 (1999), as support for his proposition that a trial court may not draw an adverse inference from defendant's silence at sentencing. In *Mitchell*, however, the issue was whether a trial court may draw an adverse *factual* inference from a defendant's silence at sentencing after she has voluntarily entered into a guilty plea. *Id.* at 316-17. Here, the court did not rely upon defendant's silence at the PSI to draw a negative inference about the facts or circumstances of his criminal behavior, but rather considered defendant's silence at the PSI as one factor in determining whether defendant had accepted responsibility and expressed remorse for his violent criminal behavior. See *id.* at 330 (expressly not reaching the question of whether a defendant's silence may bear upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of downward sentencing adjustments).

Indeed, it is entirely proper for a court to consider whether a defendant has accepted responsibility for the offense at sentencing without violating his privilege against self-incrimination. In *State v. Gorbea*, 169 Vt. 57, 61, 726 A.2d 68, 71 (1999), we affirmed "the general rule ... that a sentencing court may properly consider a defendant's failure to accept responsibility for the offense without violating a defendant's privilege against self-incrimination." A key element in a claim that the privilege against self-incrimination was violated is whether the testimony was compelled. *McKune v. Lile*, 536 U.S. 24, 35-36, 122 S. Ct. 2017, 2026 (2002). That determination, however, is mitigated by the context in which the "testimony" is sought. Thus, a "broad range of choices that might infringe constitutional rights in free society fall within the expected conditions ... of those who have suffered a lawful conviction." *Id.* at 36, 122 S. Ct. at 2026. Given the sentencing court's broad discretion in imposing sentences, *State v. Moquin*, 138 Vt. 160, 162, 411 A.2d 1355, 1357 (1980), whether defendant spoke at the PSI would not necessarily have had a direct effect on the determination of the duration and type of defendant's sentence. Rather, whether defendant admits responsibility for his crime is but one factor among many that the court considers. Therefore, the choice faced by defendant at the PSI is not one that requires defendant to produce

"compelled" testimony. In this situation, the court's responsibility to ensure proper sentencing based on statutory factors overrides any perceived right not to speak at various sentencing proceedings, to the extent that the court may consider whether defendant accepted responsibility for his actions. See *McKune*, 536 U.S. at 37-38, 122 S. Ct. at 2027 (privilege against self-incrimination not violated where the defendant refused to admit responsibility for his crimes in mandatory sexual abuse treatment program); see also *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 286 (1998) (voluntary clemency interview does not violate privilege against self-incrimination even though adverse inferences may be drawn against the defendant because no testimony is compelled). Therefore, defendant's protections against self-incrimination were not violated when the court accepted the recommendations of the PSI.

Moreover, defendant was not silent at his sentencing hearing. Instead, the transcripts reveal that defendant spoke to the court about his work habits, family life, personal generosity, and his past feelings toward the victim. Most notably, defendant specifically asserted to the court, "I am very sorry that somebody got hurt in the long run because I don't want nobody to get hurt." The trial court considered these statements and concluded that they did not sufficiently express remorse, and did not indicate that defendant had accepted the consequences of his own actions. See *Sims*, 158 Vt. at 188, 608 A.2d at 1158 (a sincere demonstration of remorse constitutes an important step toward rehabilitation). In addition to considering the extent of defendant's remorse, the trial court considered other factors, including the seriousness of the crime, the nature of the victim's injuries, and defendant's past criminal history. Based on an evaluation of all those factors, the court concluded that defendant was not a good candidate for probation. Because the court's sentence was within the statutory limits, and the court properly considered the PSI, there is no error.

Defendant next claims that the trial court erred when it denied his request for access to the private residence that was the crime scene. Defendant filed a motion seeking a court order compelling the current occupants to allow him access to their home. At the time of the hearing on the motion, the victim no longer lived in the home where the crime occurred and the current occupants did not want defendant or defense counsel inspecting their home or their property. Defendant argues that because the victim previously allowed the State to inspect her home and to take photographs, the court should have ordered the current occupants to allow him similar access. We disagree.

■ Under V.R.Cr.P. 16(a)(2) when the prosecutor has custody of or controls a crime scene he must permit the defense access. The rule, however, imposes no duty on the prosecutor who does not have control of the crime scene.[1] *Id.* In this case, defendant does not dispute that the victim, her family, and the subsequent occupants of the house, respectively, had and maintained control of the crime scene — the prosecutor had neither the duty, nor the authority, to grant the defense access.

■ A defendant's need for access to a crime scene controlled by a private third party must be balanced against the property occupant's right to privacy. Courts have generally struck that balance by requiring a defendant to make some showing that the requested intrusion is relevant and material to the defense. See *Bullen v. Superior Court*, 251 Cal. Rptr. 32, 34 (Ct. App. 1988) (defendant must show plausible justification and good cause to warrant intrusion into private home); *People v. Poole*, 462 N.E.2d 810, 812-13 (Ill. App. Ct. 1984) (defendant's request to enter private home to take pictures denied where defendant could not establish that pictures would be probative); *People v. Nicholas*, 599 N.Y.S.2d 779, 783 (Sup. Ct. 1993) (denying right to inspect private property where no showing that investigation "would yield relevant" information different from that already received from photographs of the scene); *State ex rel. Beach v. Norblad*, 781 P.2d 349, 350 (Or. 1989) (court did not have authority to order third party to open her home to defense counsel and expert); *Henshaw v. Commw.*, 451 S.E.2d 415, 419 (Va. Ct. App. 1994) (defense counsel must make prima facie showing on requested inspection's relevance and materiality). Here, defendant offered no reason or justification why the court should order the occupants to allow him to enter their home. Defendant claims that requiring him to show that inspection of the crime scene would yield relevant material evidence violates attorney work-product privilege.[2] It is quite possible, however,

---

[1] Defendant implies that the prosecution impeded defendant's access to the crime scene when it explained to the court that the current occupants did not wish to grant defense counsel access to the property. There is no merit to this charge. At the hearing on defendant's motion, defense counsel was unable to tell the court the identity of the current occupants. The state's attorney was asked by the court to fill in the factual gaps that the defense did not have. There is no evidence that the state's attorney contacted or advised the property owners to not allow defense counsel access. V.R.Cr.P. 16 was not violated.

[2] Defendant's reliance on *Killington, Ltd. v. Lash*, 153 Vt. 628, 572 A.2d 1368 (1990), to support his proposition that a moving criminal defendant may be relieved of his prima

that defendant could have given the court some indication as to why he needed to inspect the premises without revealing attorney work-product. See *Killington*, 153 Vt. at 647, 572 A.2d at 1379 ("the work-product exemption is a narrow one"). It is telling that even before this Court defense counsel has not indicated what information he hoped to gain from access. Given the need for the court to consider a property owner's right to privacy, defendant may not hide behind the attorney work-product privilege to relieve himself of the burden of making a showing of relevance and materiality.

Indeed, it is not clear that even had defendant attempted to meet this prima facie burden, that he would have succeeded in identifying a sufficient reason for the inspection. The State provided copies of its crime scene photographs to the defense, the victim testified at trial, and there was overwhelming evidence of defendant's guilt. On the record there is no indication how defense strategy would have changed had defense counsel seen the crime scene firsthand. See *Bullen*, 251 Cal. Rptr. at 34 (defense counsel's reasons that it was necessary to "view the scene of the crime, observe spatial distance, [and] investigate possible defense theories" were "conclusional" and "inadequate" to justify intrusion into private home). Therefore, the court did not err in denying defendant's request for access to the crime scene.

Defendant takes issue with three aspects of the trial that he terms "experimental trial procedures." First, defendant asserts that his jury was not selected randomly because jurors were selected from a list of all the jurors in the pool that day. Second, defendant claims that the court should not have allowed the jurors to take notes during the trial. Third, defendant claims that the court should not have given the jury preliminary instructions based on the crimes charged before the trial began.

Defendant's arguments are unavailing. First, common sense demonstrates that, in fact, his jury draw was random. It is uncontested that the jury pool, that is the forty people selected for duty that day, was randomly selected from a list of potential jurors. The fact that those randomly selected people were then placed on a list, and that list was followed in order does not disrupt the "randomness" of the panel

---

facie duty to show materiality, before gaining compulsory access to a private residence, however, is misplaced. In *Killington* we dealt with the issue of private access to public records with respect to the specific status of a public agency and its ability to exercise both executive privilege and attorney work-product privilege.

selected. One randomly created list is no more fair or impartial than any other. Defendant cites no case to support his contention that the list of randomly selected jurors must be reshuffled between each pool selection. Defendant's right to challenge the jury pool is limited to "a right of rejection, not one of selection . . . . Thus, defendant does not have a right to any specific juror; his right is to a fair and impartial jury." *State v. Calloway*, 157 Vt. 217, 220, 596 A.2d 368, 371 (1991) (internal quotations omitted). Absent any argument that the jury in this case was unfair or partial, there is no error.

██ Nor do we find that the "experimental" procedures of juror note-taking and preliminary instructions were improper. It is becoming increasingly common for judges to use new practices "to assist the jurors in their consideration of the evidence and the law, and in carrying out, with increased confidence and satisfaction, their role and responsibilities as the ultimate arbiters" of cases. *Jury Trial Innovations in Massachusetts*, xvii (Hon. P. Lauriat ed., 2000). Specifically, juror note-taking has become widespread, and in fact is specifically authorized by our civil rules. See, e.g., Ariz. R. Crim. P. 18.6(d); Ma. Super. Ct. R. 8A; V.R.C.P. 39(e). A similar rule allowing note-taking in criminal trials has been proposed in Vermont by our Committee on Jury Communications, Understanding and Deliberation. That the rule has not yet become official, however, does not indicate error. The trial court was within its discretion in permitting note-taking. See, e.g., *Esaw v. Friedman*, 586 A.2d 1164, 1168 n.9 (Conn. 1991) (collecting cases recognizing vast majority of courts that permit trial judges to allow note-taking within their discretion). As an added precaution, the court gave the jury an instruction regarding the appropriate use of their notes to ensure that the jurors did not accord their notes undue weight. See Lauriat, *supra*, at 25-26 (sample juror instructions similar to the one issued by this court).

██ The use of preliminary juror instructions was similarly acceptable. Preliminary instruction is useful to "help the jury identify, recall, and evaluate the pertinent evidence [and] enhance[] juror's ability to remember information presented at trial and to link the evidence to relevant issues." Lauriat, *supra*, at 54. In any event, defendant has failed to demonstrate any prejudice resulting from the preliminary jury instructions. We disagree with defendant's claim that the "experimental procedures" are "structural error" that do not require defendant to show prejudice. We have stated that "structural

error" involves a "defect that affected the framework in which the trial proceeded, and thus, prevented the trial from serving its function as a vehicle for determining the guilt or innocence of the defendant." *In re Hunt*, 163 Vt. 383, 387, 658 A.2d 919, 922 (1995) (internal quotations omitted). Preliminary instructions do not prevent the trial court from determining defendant's guilt or innocence, particularly where there is no claim that the instructions stated the relevant law incorrectly. Accordingly, there was no error.

Defendant further asserts that the court unreasonably limited the scope of defendant's cross-examination. Defendant identifies a few lines of questioning of the victim and another witness that the court did not permit. Specifically, defendant was not allowed to question the victim on the source of her medical insurance for an unrelated incident, he was limited in the extent to which he could question the victim on her prior relationship with defendant, and he was restricted in questions regarding a business relationship between defendant and another witness. Defendant argues that these limitations violated his constitutional right to confront witnesses against him. There was no error.

A defendant's right to confrontation is not absolute, and is limited by the requirements that evidence must be relevant, V.R.E. 402, and more probative than prejudicial, V.R.E. 403. *State v. Findlay*, 171 Vt. 594, 595, 765 A.2d 483, 486 (2000) (mem.). The trial court's resolution of evidentiary issues is discretionary, and "may impose reasonable limits on the scope of a defendant's cross-examination if it is based upon concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. Fuller*, 168 Vt. 396, 404, 721 A.2d 475, 481 (1998) (internal quotations omitted). In *Findlay*, we overturned a limitation on cross-examination where the defendant sought to question a police officer about the details of the drug purchase that was the criminal transaction at issue. In this case, by contrast, it is apparent that the trial court limited cross-examination on issues that were irrelevant or overly prejudicial to the issue of defendant's guilt or innocence. There was no abuse of discretion.

Finally, defendant contends that the State violated V.R.Cr.P. 26(c) when it introduced evidence of defendant's prior bad acts without giving defendant notice. V.R.Cr.P. 26(c) provides that when the State "intends to offer evidence of other criminal offenses under Rule 404(b)

of the Vermont Rules of Evidence, . . . at least seven days before the trial [the State] shall furnish to the [defendant] a written statement of the acts or offenses it intends to offer." At trial, the State elicited from the victim several statements that defendant allegedly threatened to kill her or her dog, and the victim's fear that, on the night of the incident, defendant would return to the house and burn it down. The State did not give notice that it would offer these statements in evidence. Defendant claims that these statements fall within V.R.Cr.P. 26(c), and thus he was entitled to notice before the State could use them.

Regardless of whether these statements fell within the coverage of Rule 26(c), defendant has failed to explain how he was harmed by the lack of notice. The contested statements were ancillary to the incident at issue, and not central to either the State's prosecution or the defense's theory of the case. The evidence of defendant's guilt in this case was overwhelming, and thus whether or not defendant previously threatened her or her dog is not particularly probative of what happened on the night in question. We therefore find that any error was harmless. See *State v. Kinney*, 171 Vt. 239, 244, 762 A.2d 833, 838 (2000) (an error is not grounds for reversal if we can determine beyond a reasonable doubt that the result would have been the same in the absence of the error).

*Affirmed.*