2015 COA 18

**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**IN the INTEREST OF E.G., Juvenile–Appellant.**

**Court of Appeals No. 13CA1900**

Colorado Court of Appeals, Div. VI.

Announced February 26, 2015

As Modified March 12, 2015

Rehearing Denied March 19, 2015

Cynthia H. Coffman, Attorney General, Jacob R. Lofgren, Assistant Attorney General, Denver, Colorado, for Petitioner–Appellee

Douglas K. Wilson, Colorado State Public Defender, Kathryn Crampton, Deputy Public Defender, Greeley, Colorado, for Juvenile–Appellant

Opinion by JUDGE FOX

¶ 1 The defendant, E.G., appeals his judgment of conviction, entered on jury verdicts, for two counts of sexual assault on a child and two counts of sexual assault—pattern of abuse. We affirm and remand for sentencing.

### I. Relevant Background

¶ 2 E.G. was charged with two counts of sexual assault on a child and two pattern of abuse sentence enhancers for sexually assaulting his younger cousins over a two-year period in the home of their mutual grandmother. E.G. was later charged as an aggravated juvenile offender under section 19–2–601, C.R.S.2014.

¶ 3 Before trial, E.G. filed a motion requesting court-ordered access to the crime scene in the basement of his grandmother's home. E.G. did not serve the motion on his grandmother, but he informally asked her permission and she denied him access. At the motions hearing, the prosecution argued that the court did not have authority to order a private person to open her residence to the defense. The court agreed and denied E.G.'s motion for access to the crime scene.

¶ 4 A jury convicted E.G. as charged, and the court sentenced him, at the age of twenty-two, directly to Department of Corrections' (DOC) custody for five years.

¶ 5 On appeal, E.G. contends that the trial court erred when it (1) denied him access to the crime scene inside his grandmother's home; (2) impermissibly curtailed his cross-examination of the forensic interviewer; and (3) improperly sentenced him directly to DOC custody. We address each contention below.

### II. Access to the Crime Scene

¶ 6 E.G. asserts that the trial court erred when it denied, based on lack of authority, his motion requesting court-ordered access to the crime scene in the basement of his grandmother's home. We conclude that a trial court has the authority to allow discovery of a crime scene to the defense, even if the discovery implicates constitutionally-protected privacy rights of a non-party, provided that the defendant's justification for the information, which derives from his constitutional rights to due process and to present a defense, outweighs the privacy interests. However, because we also conclude that

E.G.—who previously lived at the home and was provided photographs of the crime scene before trial—failed to meet this standard, we affirm the trial court's denial of E.G.'s motion.

### A. Standards of Review

¶ 7 Whether a trial court has the legal authority to grant a discovery motion is a question of law we review de novo. *People v. Jones*, 222 P.3d 377, 379–80 (Colo.App. 2009). A trial court's denial of a defendant's discovery motion, however, is reviewed for an abuse of discretion. *People ex rel. S.G.*, 91 P.3d 443, 450 (Colo.App.2004). An abuse of discretion occurs when the trial court's decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

### B. Legal Standards

¶ 8 Although there is no general constitutional right to discovery in a criminal case, *People v. Dist. Court*, 790 P.2d 332, 338 (Colo.1990), a defendant has a constitutional right to present evidence on his behalf and to confront adverse witnesses, *United States v. Nixon*, 418 U.S. 683, 771, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *People v. Chard*, 808 P.2d 351, 353 (Colo.1991). The United States Supreme Court has construed these rights as granting a defendant the right to compel material evidence from private third parties, subject to certain limitations. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

¶ 9 Colorado courts also authorize the discovery of information that implicates non-party privacy rights. For example, in *Chard*, 808 P.2d at 353–56, our supreme court held that a trial court, in its discretion, may order a victim in a sexual assault case to undergo an involuntary psychological or physical examination, provided that the defendant's need to discover the information outweighs the victim's privacy interests. *See also People v. Estorga*, 200 Colo. 78, 81–82, 612 P.2d 520, 523–24 (1980); *People v. King*, 41 Colo.App. 177, 179, 581 P.2d 739, 741 (1978).

¶ 10 Similarly, in *People v. Wittrein*, 221 P.3d 1076, 1085 (Colo.2009), the supreme court held that a child's and parent's privacy rights to the non-disclosure of the child's educational records can be outweighed by an adequate showing of the defendant's need for the evidence. *See also People v. Bachofer*, 192 P.3d 454, 460 (Colo.App.2008) (holding that a court may order the release of confidential school records to a defendant in a criminal case upon a proper showing of need).

¶ 11 Also, in *People v. Spykstra*, 234 P.3d 662, 670 (Colo.2010), the court acknowledged that pretrial discovery subpoenas may be issued for materials implicating privilege, confidentiality, or privacy rights of a third party, provided that there is a balancing of interests and the defendant makes a sufficient showing of need for the disclosure of material information.

¶ 12 Our supreme court has similarly weighed the defendant's right to discover evidence against non-party privacy rights in other contexts. *See, e.g., Williams v. Dist. Court*, 866 P.2d 908, 912–13 (Colo.1993) (balancing a defendant's interest in obtaining sufficient evidence to present his case against a non-party's privacy right to keep information regarding past intimate relationships confidential); *Belle Bonfils Mem'l Blood Ctr. v. Dist. Court*, 763 P.2d 1003, 1011–13 (Colo. 1988) (recognizing that disclosure of third-party blood donors' records implicates rights to privacy, but allowing disclosure pursuant to a limited discovery procedure that protects donors' privacy).

¶ 13 While informative, these Colorado cases do not address the right of a defendant to access real estate that cannot be brought into court, such as a crime scene inside a non-party's private residence. Courts in other jurisdictions, however, have specifically held that a defendant's constitutional rights to due process and to present evidence in his defense may include the right to access a crime scene in a private residence. In *Commonwealth v. Matis*, 446 Mass. 632, 915 N.E.2d 212, 213 (2006), the Supreme Judicial Court of Massachusetts concluded that a court may order access to a crime scene in a private residence if the defendant demon-

strates that the information obtainable at the scene is material and relevant. Likewise, a New York court has held that "[t]he constitutional right to compulsory process gives a defendant a right to compel discovery from a private third party [including the right to access a private residence] if justification exists which would outweigh the rights and legitimate interests of the third party." *People v. Nicholas*, 157 Misc.2d 947, 599 N.Y.S.2d 779, 780 (N.Y.Sup.Ct.1993) (citing *Chambers*, 410 U.S. 284, 93 S.Ct. 1038).

¶ 14 In *Bullen v. Superior Court of Sacramento*, 204 Cal.App.3d 22, 251 Cal.Rptr. 32, 33 (1988), a California appellate court held that a court may grant a defendant's motion to discover a crime scene within a private residence if the defendant provides a "plausible justification" and demonstrates an "adequate showing of need" that is "more than speculative" and that outweighs the legitimate interests of others. And finally, the North Carolina Supreme Court, in *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, 578 (1982), held that a defendant has the right to view a crime scene in a private residence when the lack of such evidence denies the defendant the fundamental fairness to which he is entitled as a matter of due process.

■ ¶ 15 Consistent with these cases, we agree that a defendant's right to inspect an alleged crime scene clearly implicates concepts of fundamental fairness and due process. *See Chambers*, 410 U.S. at 294, 93 S.Ct. 1038; *Washington*, 388 U.S. at 19, 87 S.Ct. 1920. We therefore hold that a trial court may authorize access to a crime scene to the defense, even if such access implicates constitutionally-protected privacy rights of a non-party, provided that the defendant's justification for the information outweighs any privacy interests. *See Chambers*, 410 U.S. at 294, 93 S.Ct. 1038; *Washington*, 388 U.S. at 19, 87 S.Ct. 1920. To obtain access, the defendant must demonstrate that the evidence desired is relevant, material, and necessary to his defense, and the court must balance the defendant's proffered justification with the rights and legitimate interests of the non-party resident. *See Wittrein*, 221 P.3d at 1085; *Nicholas*, 599 N.Y.S.2d at 783 (requiring defense counsel to make a prima

facie showing that his proposed inspection "would yield relevant material evidence, not already provided, necessary for the preparation of the defense case"); *see also State in Interest of A.B.*, 219 N.J. 542, 99 A.3d 782, 793 (2014) (disapproving discovery requests that have the objective of "causing intimidation, harassment, or abuse").

¶ 16 We now consider whether access to the crime scene was warranted here. *See, e.g., Miller v. Alabama*, 567 U.S. ——, 132 S.Ct. 2455, 2461–62, 2475, 183 L.Ed.2d 407 (2012) (applying a new rule to the case before the court); *Wittrein*, 221 P.3d at 1084–85 (developing a balancing test to weigh a defendant's need to discover information with the privacy rights of the non-party possessor of that information and applying the test to the case before the court); *King*, 41 Colo. App. at 179, 581 P.2d at 741 (applying a "compelling need" test to a defendant's discovery request for the first time).

### C. Analysis

■ ¶ 17 As noted, we conclude that the trial court erred in stating that it lacked authority to allow access to the crime scene. However, because E.G. failed to meet the standard above, the court properly denied his request for access. E.G.'s motion for access and his arguments at the motions hearing failed to demonstrate that his inspection of the crime scene would yield relevant material evidence necessary to present his defense, especially given that he previously lived in the residence and that photographs of the scene were later produced to him and he did not renew or otherwise supplement his previous request.

¶ 18 E.G.'s motion requested permission to "view and photograph the location of the incidents" and "photograph the physical space where the alleged incident occurred." At the motions hearing, E.G.'s counsel similarly stated that E.G. needed to "get a sense of the physical space ... where it is that [the crime] is alleged to have occurred." E.G.'s counsel argued that the scene constituted material evidence simply by virtue of the fact that "it is the alleged crime scene."

¶ 19 E.G.'s counsel, however, failed to demonstrate specifically how accessing the crime scene would produce material and relevant evidence not otherwise provided to him. He referenced no specific evidentiary purpose for which he needed this evidence to present his defense at trial. Likewise, he failed to elaborate as to why viewing, photographing, or sensing the crime scene—where E.G. had previously lived—was essential to the defense trial strategy. *See Wittrein*, 221 P.3d at 1085 (a defendant must articulate a specific need for the information requested to outweigh privacy interests). Rather, his request was general and speculative and therefore insufficient to overcome the grandmother's privacy interests. *See Chard*, 808 P.2d at 356 (speculative evidence insufficient to overcome privacy rights); *see also State v. Muscari*, 174 Vt. 101, 807 A.2d 407, 417–18 (2002) (a defendant must make some showing that the requested intrusion is relevant and material to the defense to demonstrate his need for access to a crime scene controlled by a private third party).

¶ 20 E.G. now asserts that, with access to the crime scene, he could have explored sound dynamics in the house, examined the specific layout of the rooms in relation to the basement, and potentially impeached witnesses' testimony at trial using that evidence. Although these reasons are more specific and arguably more compelling than those referenced in his original motion, *see Jefferson Cnty. Sch. Dist. R–1 v. Justus*, 725 P.2d 767, 773 (Colo.1986), E.G. did not alert the trial court to these reasons before or during trial, and we cannot consider them for the first time on appeal. *See People v. Greer*, 262 P.3d 920, 929 (Colo.App.2011).

¶ 21 Moreover, the People delivered, as requested in E.G.'s motion, photographs of the crime scene to him before trial, diminishing his need for access. After receiving the photos, E.G.'s counsel never argued to the court that they were insufficient, nor did he renew his request for access to the crime scene following their disclosure. He made no assertions regarding any additional relevant information that could be obtained only by entry into the grandmother's home. *See Nicholas*, 599 N.Y.S.2d at 780 (denying the defendant's request for access to the crime scene in the victim's apartment in part because the defendant had crime scene reports and photographs that he did not argue were insufficient).

¶ 22 Finally, the People raise concerns about the grandmother's right to notice and the opportunity to be heard regarding access to her home. The People assert that the grandmother was never served with E.G.'s motion requesting access to her home. Indeed, the record reflects that E.G.'s grandmother was never served with a subpoena, *see Spykstra*, 234 P.3d at 667–71 (outlining the procedure for issuing third party subpoenas to produce evidence); a request to inspect, *see* C.R.C.P. 34(c); or a court order seeking access to her home. And, she never appeared before the court to be heard in opposition to E.G.'s request for access.

¶ 23 We recognize the importance of protecting the due process rights of third party possessors of evidence, particularly when their privacy rights are implicated. However, because we affirm on other grounds, we need not address the proper procedures for doing so.[1]

1. Crim. P. 17 does not specifically permit the court to subpoena evidence that cannot be brought into court, such as real estate. The Colorado Supreme Court addressed the application and scope of Crim. P. 17 in *People v. Spykstra*, 234 P.3d 662, 667–70 (Colo.2010). The court held that the trial court improperly permitted the defendant to enter the victim's home and search his parents' computers for e-mails because (1) the trial court improperly converted a Crim. P. 17 subpoena into an oppressive search warrant and (2) the defendant failed to show a sufficient need and factual basis for requesting access to the evidence. *Id.* at 666. The court recognized that the preferred method of production was for the parents, following a sufficient showing of need by the defendant, to produce the desired e-mails in court, rather than allowing the defendant into the home to retrieve them. *Id.* at 671. The court did not, however, address the applicability of C.R.C.P. 34(c) or of Crim. P. 17 subpoenas for evidence that cannot be brought into court—particularly when there is no less oppressive mechanism and when the defendant's constitutional rights are at stake. And, *Thompson v. Thornton*, 198 P.3d 1281, 1283–84 (Colo. App.2008), which interprets the analogous civil rule governing subpoenas duces tecum, states that "'tangible things' does not include real estate." *See* C.R.C.P. 45. However, because denial of a defendant's right to present evidence,

¶ 24 In accordance with these principles, we conclude that the trial court's denial of E.G.'s request for access to the crime scene in the basement of his grandmother's home was not an abuse of discretion. *See S.G.,* 91 P.3d at 450.

### III. Cross–Examination of the Forensic Interviewer

¶ 25 E.G. next contends that the trial court reversibly erred in limiting E.G.'s cross-examination of the forensic interviewer. We disagree.

### A. Standard of Review

¶ 26 We review the trial court's limits on cross-examination for an abuse of discretion. *People v. Houser,* 2013 COA 11, ¶ 57, 337 P.3d 1238. It is constitutional error for a trial court to excessively limit cross-examination, especially when it concerns a witness' bias, prejudice, or motive for testifying. *Merritt v. People,* 842 P.2d 162, 167 (Colo.1992). We defer to a trial court's findings of fact if those findings are supported by competent evidence in the record. *People v. Pitts,* 13 P.3d 1218, 1221 (Colo.2000).

### B. Legal Standards

¶ 27 A defendant has a constitutional right to confront and cross-examine witnesses. *Krutsinger v. People,* 219 P.3d 1054, 1061 (Colo.2009). This right includes the ability to cross-examine witnesses about evidence tending to show bias or to impeach. *People v. Taylor,* 190 Colo. 210, 212, 545 P.2d 703, 705 (1976). The right to confront, however, does not entitle a defendant to unlimited cross-examination, *Merritt,* 842 P.2d at 166, and the trial court must ensure that "the sideshow does not take over the circus," *Taylor,* 190 Colo. at 213, 545 P.2d at 706 (internal quotation marks omitted).

¶ 28 The court therefore has substantial discretion to limit cross-examination if the questioning is irrelevant, prejudicial, or confuses the issues before the jury. *People v. Saiz,* 32 P.3d 441, 449 (Colo.2001). The

court may preclude inquiries into biases that have little probative force and little effect on the witness's credibility. *Taylor,* 190 Colo. at 212–13, 545 P.2d at 705. The court may also curtail the presentation of "evidence [that is] needlessly cumulative." *Saiz,* 32 P.3d at 448; *see* CRE 403.

¶ 29 Unless the court's restriction is so severe as to deprive the defendant of his meaningful right to cross-examine the witness, we will not disturb it on appeal. *See Saiz,* 32 P.3d at 449.

### C. Impeachment Evidence

¶ 30 E.G. first contends that the trial court erred when it terminated his counsel's attempts to impeach the victims through the live testimony of the forensic interviewer. We discern no error.

#### 1. Additional Background

¶ 31 E.G.'s counsel asked the forensic interviewer a series of questions intended to impeach the victims through their forensic interview statements. Counsel repeatedly asked the forensic interviewer what he did and did not recall about the victims' interview answers. The court, sua sponte, paused the cross-examination and prevented any further inquiry into the forensic interviewer's recollection of the victims' responses. Counsel argued that his questions constituted proper impeachment and that he should be allowed to challenge one witness's statement with another's. The court rejected this argument because the forensic interview tapes were already in evidence and counsel had already impeached the victims during prior cross-examination of them; it was, therefore, needless to question the forensic interviewer on her recollection of those same interviews. Citing CRE 611, the court excluded further inquiry as a "needless consumption of time" and as "cumulative."

#### 2. Analysis

¶ 32 We see no abuse of discretion in the court's decision to exclude the evidence as

including a right to access the crime scene, implicates constitutional rights not applicable in the civil context, we question *Thompson*'s applicabil-

ity here. *See People v. Chard,* 808 P.2d 351, 353 (Colo.1991); *see also* C.R.C.P. 34(c).

cumulative. *See Houser,* ¶ 57. The victims' forensic interview responses, including the inconsistencies contained therein, were already before the jury. Videotapes of the interviews were admitted into evidence and played for the jury before the forensic interviewer's cross-examination. And, E.G.'s counsel had invited the jury to use the videos to "judge the credibility of the [victims]." In addition, counsel highlighted the victim's inconsistent interview statements in opening arguments and during cross-examination of the victims. Moreover, before the court excluded this evidence, E.G.'s counsel managed to ask the forensic interviewer multiple questions about the victims' inconsistent interview responses. The trial court's prevention of further cumulative inquiry into the matter did not deprive E.G. of his right to meaningfully cross-examine the forensic interviewer on the issue. *See Saiz,* 32 P.3d at 449 (concluding that the trial court's exclusion of impeachment evidence was proper because the defendant already had "ample opportunities ... to present his theory"). Thus, the court's actions were not arbitrary, unreasonable, or unfair. *See Houser,* ¶ 57.

¶ 33 E.G. appears to further argue that because the forensic interview tapes were offered by the prosecution, they were somehow disadvantageous to him. He contends that he should have been allowed to present his own additional impeachment evidence.

¶ 34 E.G.'s counsel's use of the tapes during trial refutes E.G.'s assertions that the videos were disadvantageous to him and that he could not use them for impeachment. Counsel referenced the videotaped interviews during opening arguments, cross-examination of the victims, and cross-examination of the forensic interviewer. As well, during closing argument, he compared and contrasted the victims' trial testimony with their prior inconsistent interview statements. Thus, E.G.'s counsel used the tapes to E.G.'s advantage throughout trial. These tapes were the best evidence of what was and was not said during the interviews. Therefore, the court did not abuse its discretion in preventing additional questions about the interview questions and answers. *See id.*

## D. The Forensic Interviewer's Interview Questions

¶ 35 E.G. also contends that the trial court erroneously precluded inquiry into which interview questions the forensic interviewer did and did not ask the victims. Again, we discern no error.

### 1. Additional Background

¶ 36 On cross-examination, E.G.'s counsel inquired into whether the forensic interviewer asked certain questions of the victims during her interviews with them. For example, counsel asked the forensic interviewer, "You didn't ask [the victim] about the circumstances of the initial disclosure until after [taking a] break, correct?" Counsel also inquired, "You didn't ask [the victim] about any general impression or attitude that he had towards his cousin, [E.G.]?" Counsel posed similar "you didn't ask" questions to the forensic interviewer at least eleven other times during cross-examination.

¶ 37 Eventually, the prosecutor objected to this questioning as repetitious because videotapes of the interviews were already in evidence. The court agreed, sustaining the objection because the videos, which detailed "all of the information about what was asked and what was not asked" by the forensic interviewer, were already played for the jury and the court had advised E.G.'s counsel not to inquire further. Any additional questions into this evidence were therefore needless.

### 2. Analysis

¶ 38 We see no abuse of discretion here. *See id.* The record reflects that the jurors had already viewed the videotaped interviews. In addition, E.G.'s counsel had referenced the portions addressed here throughout trial. Counsel's opening argument highlighted the forensic interviewer's failure to ask certain questions during the interviews. Counsel cross-examined the victims on the issue, specifically inquiring which questions the forensic interviewer asked them and which she did not. Moreover, before the prosecutor's objection, E.G.'s counsel asked the forensic interviewer multiple questions regarding her interview techniques and conduct, including ques-

tions about what the forensic interviewer did and did not ask.

¶ 39 The trial court did not deprive E.G. of his right to meaningfully cross-examine the forensic interviewer on the issue, see Saiz, 32 P.3d at 449, and its decision to prevent further inquiry into the matter was not an abuse of discretion. See Houser, ¶ 57.

### E. Evidence of Bias

¶ 40 E.G. also objects to the court's preclusion of his counsel's attempts to cross-examine the forensic interviewer about potential bias. We discern no error.

#### 1. Additional Background

¶ 41 During cross-examination, E.G.'s counsel sought inquiry into the forensic interviewer's connections with the victim compensation board and multidisciplinary team, which counsel argued were affiliated with the district attorney's office, thereby implicating the forensic interviewer's bias in testifying.

¶ 42 Following the prosecutor's objection, the court precluded the inquiry because no evidence demonstrated that "[the forensic interviewer was] involved in victim's compensation in this case." The court further concluded that victim compensation is "separate from the District Attorney's Office," and that inquiry into it would "give a false impression to the jury."

#### 2. Analysis

¶ 43 We see no abuse of discretion here. See id. It is undisputed that the forensic interviewer was not a member of the victim compensation board during any stages of this case. E.G. argues that, despite this, any past relationship was relevant to the forensic interviewer's bias and should have been admitted for that purpose. We reject this argument because a court may exclude even relevant evidence if it is more prejudicial than probative or if it is likely to confuse the jury. See Saiz, 32 P.3d at 449 ("A trial court retains the discretion to assess the incremental probative value of evidence offered by a criminal defendant and to exclude even ... relevant evidence that would be more wasteful of time, confusing, or misleading than

helpful to the jury."). Here, the court did not abuse its discretion in ruling that the evidence was "way too thin for bias" and that it would confuse the jury. See Houser, ¶ 57.

¶ 44 E.G. argues that the victim compensation unit and the district attorney's office are related because (1) victim compensation information can be found on the district attorney's website and (2) the forensic interviewer can be heard briefly addressing victim compensation information in the background of an audio recording of an interview between the victims' parents and a detective. We reject both of these contentions because neither exhibit on which they are based is in the record before us. See People v. Ullery, 984 P.2d 586, 591 (Colo.1999) ("If the appealing party fails to provide us with such a complete record, we must presume the correctness of the trial court's proceedings."). Moreover, we defer to the trial court's finding that the entities were not related. See Pitts, 13 P.3d at 1221.

¶ 45 Accordingly, we conclude that the trial court did not abuse its discretion in limiting E.G.'s counsel's attempted inquiry into the forensic interviewer's potential bias. See Houser, ¶ 57.

### IV. Direct Sentence to DOC

¶ 46 E.G. next contends that the trial court reversibly erred when it sentenced him directly to DOC custody absent statutory authority to do so. After examining section 19–2–601, which governs the sentencing of aggravated juvenile offenders, we conclude that the trial court made insufficient findings under section 19–2–601(8) and we therefore remand.

### A. Standard of Review and Applicable Law

¶ 47 Statutory interpretation is a question of law that we review de novo. A.S. v. People, 2013 CO 63, ¶ 10, 312 P.3d 168. When construing a statute, our primary purpose is to effectuate the legislature's intent. People v. Cross, 127 P.3d 71, 73 (Colo.2006). We therefore begin with the plain language of the statute. Montes–Rodriguez v. People, 241 P.3d 924, 927 (Colo.2010). If the plain language is ambiguous, we employ rules of

statutory interpretation to resolve the ambiguity. *Id.* We read applicable statutory provisions as a whole to accord consistent, harmonious, and sensible effect to all their parts. *A.S.,* ¶ 10. In harmonizing seemingly conflicting statutes, we consider the consequences of a given construction and the ultimate goal of the statutory scheme. *Id.* at ¶ 11. We presume the General Assembly intended just and reasonable results, and we avoid statutory interpretations leading to absurd outcomes. *People in Interest of A.R.M.,* 832 P.2d 1093, 1096 (Colo.App.1992); *see also* § 2–4–201(1)(c)–(d), C.R.S.2014.

### B. Applicable Sentencing Provisions

¶ 48 A trial court must sentence an aggravated juvenile offender, like E.G., according to section 19–2–601. *A.S.,* ¶ 2; *People v. J.J.H.,* 17 P.3d 159, 162 (Colo.2001); *see also* § 19–2–907(2), C.R.S.2014 ("The judge shall sentence any juvenile adjudicated as a special offender as provided in section 19–2–908."); § 19–2–908(1)(d), C.R.S.2014 ("The court shall sentence an aggravated juvenile offender as provided in section 19–2–601."). The court has broad discretion to craft a sentence it deems appropriate for a particular juvenile offender in accordance with the alternatives set forth in that section. *A.S.,* ¶¶ 15, 21. As pertinent here, the section provides two mechanisms by which a convicted aggravated juvenile offender may be sentenced to DOC custody. § 19–2–601(5), (8).

¶ 49 First, the Department of Human Services (DHS), upon court order, may transfer an aggravated juvenile offender already in its custody to DOC custody if the juvenile has reached eighteen years of age and DHS has certified that the juvenile is no longer benefiting from its programs. § 19–2–601(5)(b)(I). To initiate such a transfer, DHS must file a request with the court, following which the court must notify the parties, set the matter for a hearing, and determine by a preponderance of the evidence whether the juvenile is no longer benefiting from the programs at DHS. § 19–2–601(5)(b)(II)–(III).

¶ 50 Second, the court may transfer an aggravated juvenile offender from DHS to DOC custody when the juvenile reaches twenty years and six months of age. § 19–2–601(8)(a)(I). Again, DHS initiates this process by filing a motion with the court "regarding further jurisdiction of the juvenile." *Id.* Upon receipt of the motion, the court notifies the interested parties, appoints counsel for the juvenile, and sets the matter for a hearing. *Id.* The court then must order the defendant to submit to a psychological evaluation and risk assessment by a mental health professional before the hearing. § 19–2–601(8)(a)(II). At the hearing, the court may transfer the defendant to DOC custody, authorize early release, place the defendant on adult parole, or permit DHS to retain custody over the defendant. § 19–2–601(8)(b). The court must consider the factors set forth in section 19–2–601(8)(c) when doing so. But, "custody of and jurisdiction over a juvenile by [DHS] shall terminate when the juvenile reaches twenty-one years of age." *Id.*

### C. Analysis

¶ 51 E.G. argues that both transfer mechanisms apply here and that the court erred by "inventing [its] own procedure" rather than following the specific procedural requirements included in sections 19–2–601(5), (8), particularly regarding DHS involvement. We disagree.

¶ 52 Neither section 19–2–601(5) nor section 19–2–601(8) addresses the specific situation in this case—the appropriate sentencing options for an aggravated juvenile offender who is already an adult (age twenty-two) when he is sentenced for acts he committed as a juvenile. The first mechanism expressly addresses juveniles already "committed to [DHS] custody" and who have been using DHS programs, neither of which has occurred here. § 19–2–601(5)(b)(I)–(III). The second mechanism similarly refers to juveniles already in DHS custody who, at age twenty years and six months, are about to age out of DHS jurisdiction entirely. § 19–2–601(8)(a)(I). Again, nothing in the record demonstrates that E.G. had been committed to DHS custody, and, because E.G. was twenty-two years old at the time of sentencing, he had already aged out of DHS custody and DHS could not exercise jurisdiction over him. *See* § 19–2–601(8)(b).

¶ 53 No other provisions of section 19–2–601 address E.G.'s situation. Therefore, there is a gap in our current statute concerning the proper sentencing scheme for aggravated juvenile offenders who are sentenced at or after turning the age of twenty-two for crimes committed as juveniles and who have therefore already aged out of DHS custody. The General Assembly, not the courts, must legislate to fill this gap, and we cannot do so here. *See People ex rel. Salazar v. Davidson,* 79 P.3d 1221, 1248 (Colo.2003) ("Quite simply, the judiciary cannot legislate.").

¶ 54 We can, however, work within the existing language of the statute, which remains the only statutory provision governing the sentencing options for aggravated juvenile offenders, *see A.S.,* ¶ 2, to effectuate the legislature's presumed intent in a manner that provides just, reasonable, and non-absurd results. *See A.R.M.,* 832 P.2d at 1096.

¶ 55 In doing so, we look specifically to the second mechanism listed above, section 19–2–601(8), because it applies to convicted juveniles who are of a similar age and in a similar situation as those defendants who fall within the statute's gap. We presume that the General Assembly included this portion of the statute to address concerns about the approaching termination of DHS custody over these defendants. In other words, we read this section as intending to aid courts in determining where to place defendants who, very shortly, would not be able to remain in DHS custody.

¶ 56 Accordingly, we see no reason why the same considerations would not apply when sentencing a defendant of a similar age who has aged out of DHS custody before sentencing. Thus, we conclude that, to effectuate just, reasonable, and non-absurd outcomes to the greatest extent possible, certain portions of section 19–2–601(8), which do not require the participation of DHS, may apply to defendants, like E.G., who fall within the statute's gap. *See A.R.M.,* 832 P.2d at 1096.

¶ 57 Specifically, the following provisions may apply to these defendants:

- Section 19–2–601(8)(a)(II), which states that the court shall order the defendant to submit to "a psychological evaluation and risk assessment by a mental health professional" who will submit a report to the court "at least fifteen days before the hearing."

- Section 19–2–601(8)(b), which authorizes the court, at the sentencing hearing, to transfer the defendant to DOC custody for placement in a correctional facility, the youthful offender system, or a community corrections program; authorize early release of the juvenile; or place the juvenile on adult parole for a period of five years.

- Section 19–2–601(8)(c), which details the non-exhaustive list of factors the court must consider in making its sentencing determination, including

the court-ordered psychological evaluation and risk assessment, the nature of the crimes committed, the prior criminal history of the offender, the maturity of the offender, the offender's behavior in custody, the offender's progress and participation in classes, programs, and educational improvement, the impact of the crimes on the victims, the likelihood of rehabilitation, the placement where the offender is most likely to succeed in reintegrating in the community, and the interest of the community in the imposition of punishment commensurate with the gravity of the offense.

¶ 58 Thus, we consider these provisions when reviewing the trial court's decision to sentence E.G. directly to DOC custody.

### D. The Trial Court's Ruling

¶ 59 In deciding to sentence E.G. to DOC custody, the court stated:

As far as the due process aspect, we're basically doing today what the statute envisioned for individuals who were sentenced to the Department of Youth Corrections [DYC] [2] who attain the age of 20–1/2 and are now brought before the Court for alternate sentencing considerations, and that's basically what we are doing here.

2. DYC is a division of DHS. *People v. Sommerfeld,* 214 P.3d 570, 572 (Colo.App.2009).

So I don't think that—although the statute does not specifically deal with what you do with a juvenile, or for a person who committed an act as a juvenile, ... when they are 22 years of age, the statute is silent on this point, but the statute gives the Court enough guidance in what happens with a juvenile who attains the age of 20-1/2 years as to what is supposed to take place, and the Court[,] guided by that provision[,] finds that it cannot impose a sentence to [DYC] because of [E.G.'s] age.

And I suspect that that will be the subject of appellate review, but the Court must impose a sentence and the Court is guided by that section. It cannot be the law that you cannot impose a sentence to anything other than probation once a person is over 20-1/2 years. That would be absurd.

And the Court has taken into account the purposes of the code with respect to the Juvenile Code and the public safety issues, the issues pertaining to [E.G.], his individual situation and what is in his best interest, and the Court has considered all of the factors contained in the presentence report and the offense-specific evaluation and the statements that were presented to the Court today....

¶ 60 The court also considered the nature of the sexual assault, calling it a "very serious type of offense" that was "not a mistake," and recognized that E.G. "has virtually no criminal history." The court added that E.G. "has a lot of family support" and "has accomplished many things."

¶ 61 The court additionally referenced E.G.'s offense specific evaluation, which was conducted after trial by a mental health professional and submitted to the court with E.G.'s presentence report. The court referenced the evaluation's conclusions that E.G. "could benefit from treatment," but his "risk of re-offense is difficult to determine [because] [n]o risk assessments are developed on individuals who are now adults who committed crimes as juveniles." The court also referenced the evaluation's conclusion that E.G.'s risk of re-offense was "low to moderate" and stated that "[t]here is really no assessment for this kind of a situation that can give the Court or anyone else confidence that this is a low risk when it's also up to a moderate risk of re-offense."

¶ 62 The court finally considered the impact of the crime on the victims and the community, stating that the crime "has had a tremendous impact on [the victims]" that is going to last "a lifetime." The court added that the severity of the offense deserved a response "for the sake of the victims and the community."

¶ 63 The court concluded by ordering that E.G. be sentenced "to [the custody of the DOC] for a term of five years" on each count, to run concurrently.

¶ 64 While the record reflects that the court considered many of the factors contained in section 19-1-601(8), the record remains unclear as to whether the court considered others. For example, the court made no mention of E.G.'s behavior in custody; his progress and participation in classes, programs, and educational improvement; and the placement where E.G. "is most likely to succeed in reintegrating in the community"— all considerations required under section 19-2-601(8)(c). The record is also devoid of the court's reasons for concluding that E.G. was not eligible for "early release" or "adult parole for a period of five years"—both viable options under section 19-2-601(8)(b).

¶ 65 Accordingly, absent a record on the court's consideration of these additional requirements under 19-2-601(8), we are unable to determine if the court's decision to sentence E.G. directly to DOC custody was proper, and we must remand for additional findings concerning the missing factors listed above.

## V. Conclusion

¶ 66 The judgment of conviction is affirmed and the case is remanded for sentencing.

JUDGE FURMAN and JUDGE J. JONES concur.