NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 32

No. 24-AP-210

| | |
|---|---|
| Ciara Kilburn and Brona Kilburn | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Bill Simmon and Vermont Community | March Term, 2025 |
| Access Media, Inc. | |

Helen M. Toor, J.

Stephanie M. Greenlees of Kaplan and Kaplan, Burlington, for Plaintiffs-Appellees/Cross-
  Appellants.

Jennifer E. McDonald of Downs Rachlin Martin PLLC, Burlington, for Defendant-Appellant/
  Cross-Appellee Vermont Community Access Media, Inc.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1. **COHEN, J.** This is an appeal from a jury verdict awarding damages to plaintiffs Ciara and Brona Kilburn for negligent supervision by defendant Vermont Community Access Media, Inc. (VCAM) of its employee, defendant Bill Simmon. In 2012, Simmon invited Ciara, who was a student in his film class, and her minor sister Brona to VCAM's premises to record a commercial. He used VCAM's video cameras to secretly record plaintiffs while they were changing clothes, then shared the videos online, where they have been viewed more than a million times. VCAM argues that the trial court erred in admitting evidence that in 2011, a VCAM manager found child pornography on a hard drive used by Simmon but took no action. VCAM further argues that the trial court erred in allowing the jury to award damages for emotional distress because there was no evidence that plaintiffs were physically injured. Alternatively, VCAM

argues that the court should have granted its request for remittitur because the damage award was duplicative and excessive. In their cross-appeal, plaintiffs claim that the trial court erred in denying their request to hold VCAM jointly and severally liable for Simmon's share of compensatory damages. We affirm.

## I. Facts

¶ 2. In 2020, plaintiffs filed the instant action asserting claims of invasion of privacy, intentional infliction of emotional distress (IIED), and negligence per se against Simmon, and claims of vicarious liability, negligence, and negligent infliction of emotional distress (NIED) against VCAM.[1] The following evidence was presented at the trial, which spanned five days in February 2024.

¶ 3. VCAM operated a community film studio and cable-access television channels in Burlington, Vermont. Simmon worked for VCAM from 2000 to September 2018. In 2012, he was promoted to director of media services. In addition to his work for VCAM, he taught introductory film classes at Community College of Vermont.

¶ 4. In November 2012, Ciara Kilburn was enrolled in Simmon's film class. She was nineteen years old at the time. Simmon asked Ciara to participate in filming a VCAM commercial one Saturday evening at the VCAM studio. He explained that the commercial would say that VCAM was "good for any occasion." He asked Ciara to bring a variety of different outfits to wear in the commercial. Ciara agreed and asked if she could bring a friend, to which Simmon consented.

---

[1] Plaintiffs also asserted vicarious liability, negligence, and NIED claims against Vermont State Colleges d/b/a Community College of Vermont (CCV), where Simmon taught the film class. The court dismissed these claims in January 2021 because Simmon was acting outside the scope of his employment for CCV and plaintiffs failed to allege facts demonstrating that CCV owed a duty of care to plaintiffs. It subsequently permitted plaintiffs to amend their complaint to state a claim of negligence against CCV. In February 2023, the court granted summary judgment to CCV on the amended negligence claim.

¶ 5.    Ciara and her seventeen-year-old sister, Brona Kilburn, went to the VCAM studio to film the commercial. Simmon directed plaintiffs to use a utility room for costume changes. Some of the costume changes required plaintiffs to remove their bra or underwear.

¶ 6.    Prior to plaintiffs' arrival, Simmon installed hidden video cameras in the utility room. Plaintiffs were unaware of the cameras. Simmon used the hidden cameras, which belonged to VCAM, to record plaintiffs changing into five to seven different outfits between takes of the commercial. Simmon then shared the videos with a stranger in an online pornography forum. The videos were subsequently posted on pornographic websites and viewed millions of times.

¶ 7.    In September 2018, plaintiffs learned of the videos for the first time from a friend. The friend heard about the videos from another acquaintance who saw one of the videos posted on a pornographic website and recognized plaintiffs. Ciara called Simmon to inquire about the video, and his muted response led her to believe he was the person responsible. She then reported the incident to police. Ciara subsequently learned that other people in the community had seen the video, which was posted on Pornhub and other sites.

¶ 8.    During the ensuing police investigation of Simmon, another manager at VCAM, Matthew Goudey, reported that in 2011 Simmon gave him a hard drive to delete the contents and make it ready for the next user. The hard drive contained lewd photographs of naked girls, whom Goudey estimated to be eleven or twelve years old. Goudey told police he was "dead sure" that Simmon put the images on the hard drive. Goudey deleted the images. During a staff meeting a few days later, Goudey reported that he had found disturbing images on a hard drive. He recommended that in future, when hard drives were returned, staff delete the contents without looking at them. No one at VCAM took any further action in response to Goudey's disclosure, and he did not report the matter to police. Simmon continued to work at VCAM until 2018.

¶ 9.    Plaintiffs both experienced panic attacks after learning about the videos. Ciara testified that she constantly felt afraid that she was being watched or recorded in public restrooms, hotels, and in her home. She received lewd messages from an acquaintance who viewed the video.

3

She experienced nightmares, deep shame, and fear for her and her sister's future due to the ongoing availability of the video online. Brona similarly testified that she had experienced hand cramping, shortness of breath, and nightmares about being sexually assaulted. She cut herself in 2022 because she couldn't handle her emotions. Both plaintiffs had engaged in therapy and were diagnosed with post-traumatic stress disorder (PTSD), depression, and anxiety, and exhibited other symptoms of serious emotional distress.

¶ 10. Following the close of evidence, VCAM argued that the trial court should not instruct the jury on plaintiffs' vicarious-liability claim because Simmon's acts were outside the scope of his employment. It further argued that plaintiffs had not established the elements of an NIED claim. The trial court agreed, and did not instruct the jury on either claim. However, the court concluded that the jury could award damages for emotional distress caused by VCAM's negligent supervision if it found the other elements of that claim to be established and instructed the jury accordingly.

¶ 11. The jury found that Simmon invaded plaintiffs' privacy and recklessly caused plaintiffs severe emotional distress. It found that VCAM negligently supervised Simmon. It awarded each plaintiff compensatory damages of $1.75 million against Simmon and $1.75 million against VCAM.[2] It awarded each plaintiff $2 million in punitive damages against Simmon.

¶ 12. Following the verdict, plaintiffs submitted a proposed final judgment order making VCAM jointly and severally liable for the compensatory damages awarded against Simmon. The court denied plaintiffs' motion, concluding that the jury verdict did not support such a judgment. It denied plaintiffs' motion for reconsideration.

¶ 13. Separately, VCAM moved to alter or amend the judgment, for a new trial, or for remittitur. VCAM argued that: the jury's verdict was an improper double award for the same conduct; VCAM could be held liable only for damages resulting from the filming and not the

---

[2] The amounts were apparently based on the number of times the videos were viewed online.

4

internet posting; the verdict was grossly excessive compared to similar cases; and plaintiffs were not entitled to compensatory damages on their negligent-supervision claim because there was no evidence that they suffered physical injuries. The court denied VCAM's motion, concluding that the jury did not award double damages for the same conduct, the jury was not asked to break down damages for the filming and the internet posting, and the verdict was within a reasonable range for defendants' conduct. The court further concluded that plaintiffs had provided evidence of physical injury or sickness in the form of cutting, hand cramps, sleeplessness, and nightmares of sexual assault. Alternatively, the court concluded that even if these were purely emotional injuries, it would be unjustifiable to deny damages for these injuries in this case. VCAM appealed and plaintiffs cross-appealed.

## II. VCAM's Arguments on Appeal

### A. Motion to Exclude Evidence of Child Pornography on VCAM Hard Drive

¶ 14. We first address VCAM's claim that the trial court erred in denying VCAM's pretrial motion to exclude evidence that Matthew Goudey found child pornography on a hard drive used by Simmon in 2011. VCAM argues that because Goudey deleted the files and there was no contemporaneous investigation of his discovery, the evidence was too attenuated to support a finding that VCAM knew or should have known that Simmon put the images on the hard drive. VCAM argues that the minimal probative value of the evidence was outweighed by its prejudicial nature.

¶ 15. We conclude that VCAM waived this challenge by stipulating at trial to the admission of the recording of Goudey's interview with police. "By agreeing to admission of certain evidence, a party waives his right to review of the trial court's ruling on appeal." State v. Spooner, 2010 VT 75, ¶ 19, 188 Vt. 356, 8 A.3d 469; see also State v. Laprade, 2008 VT 83, ¶ 11, 184 Vt. 251, 958 A.2d 1179 (declining to review claim of error regarding admission of evidence when defendant stipulated to its admission at trial). VCAM argues that its motion in limine was "far broader" than the police recording, but the record does not support this claim. The motion

5

sought to exclude evidence that Goudey discovered child pornography on a hard drive used by Simmon. The police interview recording contained this information and was largely repetitive of Goudey's trial testimony. Thus, by stipulating to the admission of the interview recording, VCAM waived its objection to the admission of Goudey's testimony.

### B. Availability of Emotional-Distress Damages for Negligent Supervision

¶ 16.    We turn to VCAM's primary argument on appeal, which is that the trial court erred in instructing the jury that it could award compensatory damages to plaintiffs for emotional distress resulting from VCAM's negligent supervision of Simmon even though there was no evidence that plaintiffs were physically injured. "A party who claims error in the jury charge has the burden of establishing both that the charge was wrong and that prejudice resulted from that error." Harris v. Carbonneau, 165 Vt. 433, 438, 685 A.2d 296, 300 (1996). We review jury instructions as a whole and will not reverse "[i]f the charge as a whole breathes the true spirit and doctrine of the law and there is no fair ground to say the jury has been misled." Winey v. William E. Dailey, Inc., 161 Vt. 129, 143, 636 A.2d 744, 753 (1993).

¶ 17.    The purpose of compensatory damages in a tort case is "as nearly as possible, to restore a person damaged to the position he would have been in had the wrong not been committed." My Sister's Place v. City of Burlington, 139 Vt. 602, 612, 433 A.2d 275, 281 (1981). "While an exact amount may be difficult to ascertain, a tortfeasor is assessed for damages which directly or proximately result from the wrong committed." Id.; see also Callan v. Hackett, 170 Vt. 609, 609, 749 A.2d 626, 628 (2000) (mem.) ("The ordinary rule in tort law is that the plaintiffs must prove, by a preponderance of the evidence, the extent and nature of their damages. Plaintiffs must further show that such damages are the direct, necessary, and probable result of defendant's negligent act." (citation omitted)).

¶ 18.    Compensatory damages can include damages for emotional distress. However, as we explained in Vincent v. DeVries, the general rule is that "[a]bsent physical contact, one may recover for negligently caused emotional distress only when the distress is accompanied by

6

substantial bodily injury or sickness."[3] 2013 VT 34, ¶ 10, 193 Vt. 574, 72 A.3d 886 (emphasis added); see Fitzgerald v. Congleton, 155 Vt. 283, 292, 583 A.2d 595, 600 (1990) (stating same).

¶ 19. At issue in Vincent was whether a jury could award damages for emotional distress resulting from legal malpractice. In analyzing this question, we reviewed our caselaw, which has consistently reaffirmed the general rule stated above. Vincent, 2013 VT 34, ¶ 12; see Goodby v. Vetpharm, Inc., 2009 VT 52, ¶ 11, 186 Vt. 63, 974 A.2d 1269 (declining to recognize special exception to recover noneconomic damages for loss of companion animals caused by negligence); Pearson v. Simmonds Precision Prods., Inc., 160 Vt. 168, 173-74, 624 A.2d 1134, 1137 (1993) (denying emotional distress damages for employer's negligent misrepresentation and negligent failure to disclose because damages for only pecuniary injuries are available for those torts). We noted, however, that in a prior case we had expressly left open "the possibility of allowing for emotional-distress damages absent physical manifestations under special circumstances where the nature of the tortious act guarantees the genuineness of the claim." Vincent, 2013 VT 34, ¶ 13 (quoting Fitzgerald, 155 Vt. at 292 n.7, 583 A.2d at 600 n.7). Two well-established examples of such special circumstances were "mishandling of bodily remains and negligent transmission of a message announcing death."[4] Id. ¶ 14. We ultimately declined to decide whether emotional-

---

[3] The tort of NIED is an exception to this rule. Vincent, 2013 VT 34, ¶ 12 n.2. To recover for NIED in the absence of physical impact, "plaintiff must show that: (1) he was within the 'zone of danger' of an act negligently directed at him by defendant, (2) he was subjected to a reasonable fear of immediate personal injury, and (3) he in fact suffered substantial bodily injury or illness as a result." Brueckner v. Norwich Univ., 169 Vt. 118, 125, 730 A.2d 1086, 1092 (1999). Plaintiffs asserted an NIED claim against VCAM in their complaint, but the trial court concluded that there was insufficient evidence to instruct the jury on such a claim and plaintiffs did not appeal that decision. The issue before us in this appeal is whether plaintiffs may recover damages for emotional distress resulting from VCAM's negligent supervision of Simmon. This theory of recovery is distinct from the NIED claim and we therefore do not consider the zone-of-danger rule in this appeal.

[4] We went on to observe in Vincent that "[a]lthough the general rule precluding emotional distress damages in ordinary negligence claims without physical impact is longstanding, well-established, and almost universally embraced, the rationales underlying the rule are less clear and, arguably, not entirely compelling." 2013 VT 34, ¶ 15. The two reasons most commonly cited in support of the rule—the unreliability of a claim of pure emotional distress and the lack of foreseeability of emotional injury resulting from negligence—appeared to be inconsistent with the

distress damages could be allowed under certain circumstances in legal-malpractice claims because we concluded that the defendant's representation of the plaintiff in a real-estate transaction "was not of such a personal and emotional nature that it would support" such an exception. Id. ¶ 25.

¶ 20. In this case, plaintiffs did not allege or show that there was any physical contact between Simmon and themselves, or any other "physical impact" resulting from VCAM's negligence. Nor does this case involve either of the exceptions to the general rule identified in Vincent for "special circumstances where the nature of the tortious act guarantees the genuineness of the claim." Id. ¶ 13 (recognizing mishandling of bodily remains or negligent transmission of message announcing death as exceptions).

¶ 21. Plaintiffs initially asserted that their PTSD diagnoses qualified as physical injuries for purposes of the Vincent rule. However, while the parties' post-trial motions were pending, we issued Zeno-Ethridge v. Comcast Corp., which held that "PTSD is a mental or emotional harm, not a physical one," and therefore "a PTSD diagnosis alone is insufficient to satisfy the 'actual injury' requirement of a negligence claim." 2024 VT 16, ¶ 35, __ Vt. __, 315 A.3d 978. In response to VCAM's motion to alter or amend the judgment, the trial court acknowledged that PTSD did not qualify as a physical injury under Zeno-Ethridge but concluded that the physical-injury requirement was still satisfied because plaintiffs presented evidence of physical effects including sleeplessness, nightmares, hand cramping, and self-harm in the form of cutting and alcohol abuse.

¶ 22. We agree with VCAM that these symptoms were insufficient to satisfy the Vincent rule because the evidence presented at trial indicated that they were physical manifestations of plaintiffs' mental and emotional injuries. In Zeno-Ethridge, we declined to rely on precedent from

recognized exceptions and common experience. Id. ¶¶ 15-16. For these reasons, some jurisdictions have begun to allow emotional-distress damages in the absence of physical impact where the defendant had a relationship with the plaintiff or undertook an obligation to the plaintiff that was "fraught with the risk of emotional harm." Id. ¶¶ 18-19.

other jurisdictions suggesting that PTSD is a bodily injury because it can cause physical changes to the body, reasoning that this "would break down entirely the logical divide between emotional and physical harms" and make it impossible to define what types of harm fell under NIED or negligence. Id. ¶ 34. The same reasoning applies here. Plaintiffs suffered primarily mental and emotional harm, as well as some physical effects arising from that harm. Under our precedent, this is not sufficient to satisfy the element of "substantial bodily injury or illness" necessary to recover emotional-distress damages in a negligence case. Id. ¶ 6; Vincent, 2013 VT 34, ¶ 25.

¶ 23. Plaintiffs argue, and the trial court apparently agreed, that this Court should recognize a new exception to the Vincent rule that applies to their case because the nature of Simmon's acts guarantees the genuineness of their emotional distress. We conclude that it is unnecessary to decide whether these circumstances justify a new exception because emotional-distress damages are available to plaintiffs for a different reason: namely, VCAM's breach of its duty to prevent its employee from using its equipment and premises to commit intentional torts for which emotional-distress damages are available as a matter of course.

¶ 24. We follow the Restatement definition of negligent supervision, which states that:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958); see Haverly v. Kaytec, Inc., 169 Vt. 350, 356-57, 738 A.2d 86, 91 (1999) (adopting Restatement definition).

¶ 25. As several courts have observed, the plain language of § 213 does not require a plaintiff to allege physical injury to recover for negligent supervision. See Kiesau v. Bantz, 686 N.W.2d 164, 172 (Iowa 2004), overruled in part on other grounds by Alcala v. Marriott Int'l, Inc., 880 N.W.2d 699 (Iowa 2016) ("A plain reading of section 213 of the Restatement (Second) of Agency reveals no requirement that an injured party must sustain physical injury to recover under

9

a claim of negligent hiring, supervision, or retention."); see also <u>Van Horne v. Muller</u>, 691 N.E.2d 74, 80 (Ill. App. Ct. 1998) (making same observation). Negligent supervision requires proof of "an underlying tort or wrongful act committed by the employee." <u>Haverly</u>, 169 Vt. at 357, 738 at 91. But we have never held that the underlying tort or wrongful act has to result in physical injury to be actionable, and the language of the Restatement does not support such a requirement. We agree with the majority position that physical injury is not a required element of a negligent-supervision claim. See <u>Colleton v. Charleston Water Sys.</u>, 225 F. Supp. 3d 362, 373 (D.S.C. 2016) (explaining that "the majority position is that a negligent supervision claim does not require physical harm," and listing cases).

¶ 26. Instead, "the underlying tort or wrongful conduct determines the compensability of the injury in a cause of action against an employer for negligent . . . supervision." <u>Kiesau</u>, 686 N.W.2d at 172; see also <u>Verhelst v. Michael D's Rest. San Antonio, Inc.</u>, 154 F. Supp. 2d 959, 968 (W.D. Tex. 2001) (stating that under Texas law, negligent supervision claim "requires that the employee in question commit an actionable tort, causing a 'legally compensable injury'—not necessarily a physical injury" (quotation omitted)). Where a negligent-supervision claim is based on the employee's commission of a tort for which pure emotional-distress damages are recoverable, it therefore follows that the plaintiff may recover damages for that portion of emotional distress attributable to the employer's negligence. As the Iowa Supreme Court has explained:

> [I]n a cause of action against an employer for negligent hiring, supervision, or retention, the employer's liability arises from the employer's own tortious conduct; the underlying tort or wrongful conduct is simply a link in the causal chain leading to compensable damages. To hold otherwise would lead to absurd results. . . . [I]f an employer's negligent hiring, supervision, or retention caused the employee to batter one person but assault another in the same incident, only the victim of the battery would be able to recover any legally compensable damages for the negligence of the employer. There is no logical explanation as to why the battered victim can recover but the assault victim cannot.

<u>Kiesau</u>, 686 N.W. 2d at 173.

¶ 27. If a negligent-supervision claim can be premised on an employee's commission of a tort for which emotional-distress damages are available even without physical impact, then such damages are available for the negligent-supervision claim as well. The employer's unreasonable failure to prevent the employee from harming the plaintiff is what makes the employer liable for the resulting damages. See Bradley v. H.A. Manosh Corp., 157 Vt. 477, 479-81, 601 A.2d 978, 980-81 (1991) (explaining that where an off-duty employee commits tort using employer's chattels or on employer's premises, "we are satisfied that the risk of liability should fall upon the employer if its failure to act was unreasonable [because] [b]earing this responsibility is inherent in defendant's business enterprise").

¶ 28. In this case, plaintiffs' negligent-supervision claim against VCAM was premised on invasion of privacy and IIED—both intentional torts for which pure emotional distress damages are recoverable. See Staruski v. Cont'l Tel. Co. of Vt., 154 Vt. 568, 574, 581 A.2d 266, 269 (1990) ("Damages may be recovered for invasion of privacy, even if the injury suffered is mental anguish alone." (quotation omitted)); Farnum v. Brattleboro Retreat, Inc., 164 Vt. 488, 497, 671 A.2d 1249, 1256 (1995) (listing elements of IIED claim). It therefore follows that VCAM may be held liable for the portion of emotional and mental harm that the jury found attributable to VCAM's failure to prevent Simmon from committing those underlying torts. Cf. Hays v. Patton-Tully Transp. Co., 844 F. Supp. 1221, 1222 (W.D. Tenn. 1993) (holding negligent-supervision claim against employer could be premised on allegation that employee's sexual harassment of plaintiff caused IIED); Grego v. Meijer, Inc., 187 F. Supp. 2d 689, 694 (W.D. Ky. 2001) (holding that Kentucky's one-year statute of limitations for personal-injury claims does not apply to negligent-supervision claims because "tort of negligent supervision does not necessarily derive from employees' torts that cause physical injury," and employer could be held liable for negligent supervision of employee who committed tort of outrage, also known as IIED).

¶ 29. VCAM argues that we should follow the holding of a Florida appellate court in G4S Secure Sols. USA, Inc. v. Golzar, 208 So. 3d 204, 208 (Fla. Dist. Ct. App. 2016), which

denied emotional-distress damages under arguably similar circumstances as this case. In <u>Golzar</u>, a security guard employed by the defendant to patrol the plaintiff's residential community used his phone to record a video of the plaintiff while she was undressing in her home. A jury awarded the plaintiff damages for the defendant's negligent hiring, retention, and supervision of the guard. The appellate court reversed, concluding that under Florida's "impact rule," the plaintiff could not recover damages for emotional distress absent proof of physical injury. <u>Id</u>. at 209. However, the <u>Golzar</u> court did not address the Restatement (Second) of Agency § 213 or the case law cited above. It gave only cursory attention to the plaintiff's argument that emotional-distress damages should be recoverable from the employer when the only foreseeable damages from the employer's intentional tort were noneconomic, apparently because the plaintiff provided no authority to support this argument. <u>Id</u>. at 210. Because the court did not address these issues, we do not find its analysis persuasive.

¶ 30.    Because we conclude that emotional-distress damages were available to plaintiffs as a result of their negligent-supervision claim being premised on intentional torts for which such damages are available regardless of physical impact, we need not address plaintiffs' argument that we should recognize a new exception to the general rule expressed in <u>Vincent</u>. That rule and our law governing NIED claims are not affected by this decision, which involves an entirely separate type of claim. Further, we emphasize the limited nature of our holding. Emotional-distress damages may be assessed against VCAM in this case because plaintiffs met the difficult burden of proving both (1) that Simmon committed the underlying intentional torts of IIED and invasion of privacy and (2) that VCAM breached its duty to prevent Simmon from committing those torts using its premises and chattels, thereby causing harm to plaintiffs.[5] Our ruling in this case should

---

[5] The jury's findings in favor of plaintiffs on the IIED and invasion-of-privacy claims, both intentional torts which allow recovery for purely emotional distress, mitigate the concerns we expressed in <u>Zeno-Ethridge</u> about the reliability of claims of emotional injury and the lack of foreseeability of emotional harm caused by ordinary negligence.

not be interpreted to alter the <u>Vincent</u> rule, or to suggest that pure emotional-distress damages are automatically available for all negligent-supervision claims.

¶ 31. The court properly instructed the jury that it could award compensatory damages to plaintiffs for emotional distress resulting from VCAM's negligent supervision of Simmon in this case. Thus, although we do not adopt the reasoning of the trial court in its order denying VCAM's motion to amend the jury verdict to omit compensatory damages for emotional distress, we affirm the result. See <u>Gilwee v. Town of Barre</u>, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980) (explaining that trial court error does "not result in reversal if the record, as here, indicates any legal ground for justifying the result," because "[a] trial court can achieve the right result for the wrong reason").

### C. Motion for Remittitur

¶ 32. VCAM alternatively argues that even if emotional-distress damages were available to plaintiffs, the court should have granted its request for remittitur because the verdict was duplicative and excessive. "Remittitur is within the sound discretion of the trial court, and its ruling will not be set aside on appeal absent abuse of discretion." <u>Shahi v. Madden</u>, 2008 VT 25, ¶ 23, 183 Vt. 320, 949 A.2d 1022.

¶ 33. VCAM first argues that by awarding each plaintiff $1.75 million against Simmon and $1.75 million against VCAM, the jury gave plaintiffs a double recovery for the same injury. "[A] plaintiff is generally not permitted to recover twice for the same injury." <u>Will v. Mill Condo. Owners' Ass'n</u>, 2006 VT 36, ¶ 7, 179 Vt. 500, 898 A.2d 1264. VCAM has failed to demonstrate that this occurred here, however. The identical awards do not by themselves prove that the jury improperly compensated plaintiffs twice for the same injuries. An equally plausible explanation is that the jury found each plaintiff suffered $3.5 million in damages and Simmon and VCAM were each responsible for one-half of the injuries. See <u>Gentile v. Cnty. of Suffolk</u>, 926 F.2d 142, 154 (2d Cir. 1991) (rejecting claim that jury acted improperly in awarding plaintiffs $75,000 on state-law claim and $75,000 on federal-law claim because "it is equally conceivable that the jury

13

found that each plaintiff suffered $150,000 worth of discrete, unduplicated injuries as a result of the County's violations of law, and merely split the total amount equally between the state and federal causes of action in announcing their award to the court on the form submitted to it"); see also Winey, 161 Vt. at 144, 636 A.2d at 753 (stating that in evaluating challenge to jury award, "we must consider the evidence in the light most favorable to the damages found by the jury and uphold the verdict if there was evidence reasonably supporting it"). This interpretation is supported by the verdict form, which expressly asked the jury to indicate whether it was awarding the same damages to be shared by the two defendants. The jury did not so indicate, and instead awarded separate damages for each defendant based on the proportion of injuries it found was attributable to each defendant. We are therefore unpersuaded that there was double recovery in this case.

¶ 34. VCAM alternatively argues that the evidence did not support holding it and Simmon equally responsible for plaintiffs' injuries. "In general, the calculation and award of compensatory damages is within the discretion of the fact finder and the award must stand unless grossly excessive." Kneebinding, Inc. v. Howell, 2018 VT 101, ¶ 84, 208 Vt. 578, 201 A.3d 326 (quotation omitted). VCAM contends that there were two separate acts of wrongdoing— Simmon's recording of plaintiffs at VCAM's facility and Simmon's subsequent distribution of the videos on the internet—and VCAM was only implicated in the first act. However, the jury was not asked to determine which acts led to specific damages. The jury could reasonably have concluded from the evidence that if VCAM had not been negligent in its supervision of Simmon, the videos would never have been posted on the internet, making VCAM equally responsible for plaintiffs' injuries as a whole.

¶ 35. Further, we are unpersuaded that the award here was grossly excessive. "We are in the field of unliquidated damages, where judgments may vary widely and yet be within permissible range." English v. Myers, 142 Vt. 144, 148, 454 A.2d 251, 253 (1982). The "size of the verdict alone does not indicate passion or prejudice." Id. at 147, 454 A.2d at 253. The evidence

14

showed that VCAM allowed Simmon to have unfettered access to VCAM's premises and equipment even after a fellow manager discovered information leading him to believe that Simmon had stored child pornography on a VCAM hard drive. Simmon subsequently used VCAM's premises and equipment to secretly record plaintiffs, one of whom was a minor, in the nude. The recordings of plaintiffs are practically impossible to remove from the internet. As the trial court noted, plaintiffs will have to live their lives knowing that friends, neighbors, colleagues, employers, and others may have seen them partially naked and that viewers might incorrectly assume that plaintiffs posted the pictures themselves. These acts caused plaintiffs severe and continuing emotional distress. Cf. State v. VanBuren, 2018 VT 95, ¶¶ 56-57, 210 Vt. 293, 214 A.3d 791 (noting substantial harm that victims of nonconsensual pornography may suffer, and observing that "[t]he personal consequences of such profound personal violation and humiliation generally include, at a minimum, extreme emotional distress"). Given the ongoing invasion of plaintiffs' privacy and the proof presented of the attendant effects on their mental and emotional health, we cannot say that the award was excessive. See English, 142 Vt. at 147-48, 454 A.2d at 253 (affirming "somewhat high" verdict because defendant presented no evidence of passion or prejudice on part of jury); In re Estate of Peters, 171 Vt. 381, 393, 765 A.2d 468, 478 (2000) ("Calculating damages is the jury's duty, and considering [decedent's] humiliation and emotional suffering, the size of the verdict alone does not show that the award was "entirely excessive."). The cases cited by VCAM involve different factual scenarios and legal claims and are not helpful comparators. We therefore affirm the jury's award of damages against VCAM.

III. Plaintiffs' Cross-Appeal

¶ 36. Finally, we consider the claim raised by plaintiffs in their cross-appeal, which is that the trial court improperly declined to hold VCAM jointly and severally liable for Simmon's share of compensatory damages.

¶ 37. Following the verdict, plaintiffs submitted a proposed final judgment order that would make VCAM jointly and severally liable for the compensatory damages awarded against

15

Simmon. Plaintiffs argued that VCAM was liable for Simmon's acts because it failed to protect plaintiffs against Simmon, citing Restatement (Third) of Torts: Apportionment of Liability § 14 (2000). VCAM opposed the proposed order on the grounds that Vermont law does not allow for joint and several liability and the jury did not indicate that it was awarding damages to be shared by the two defendants. The court declined to make VCAM jointly liable for Simmon's damages, stating: "The proposed judgment is not the place to raise legal issues that should have been addressed prior to or during the trial. The judgment must reflect the verdict of the jury."

¶ 38. Plaintiffs moved for reconsideration, arguing that multiple tortfeasors are jointly and severally liable under Vermont law. The court denied their motion, reasoning that the traditional rule had been modified by 12 V.S.A. § 1036, which makes joint tortfeasors liable only for the proportion of damages attributable to their own negligence. The court further reasoned that plaintiffs had agreed to have the jury allocate damages to each defendant and could not subsequently seek to recover the entire award against VCAM.

¶ 39. We agree with the trial court that plaintiffs implicitly waived their joint-and-several-liability claim by failing to object to the jury instructions or the verdict form. The court did not instruct the jury on joint and several liability. The only instruction relevant to this issue was the court's statement that "[i]f you conclude that both defendants are responsible for the same damages, you may only award those damages once. If you do so, please note that on the verdict form, which will be a check-off sheet for you." Because no party objected to this statement or to the court's omission of an instruction on joint and several liability, "we take the jury instructions as the governing law of the case." Follo v. Florindo, 2009 VT 11, ¶ 22, 185 Vt. 390, 970 A.2d 1230; see also V.R.C.P. 51 (requiring party to object to "the giving or the failure to give an instruction" at charge conference or before jury deliberates to preserve such objection for review).

¶ 40. Similarly, the verdict form is inconsistent with joint and several liability. However, plaintiffs did not object to the verdict form before it was presented to the jury. "Generally, objections to verdict forms must be presented to the trial court in time to allow an opportunity to

16

take corrective action." Silva v. Stevens, 156 Vt. 94, 109, 589 A.2d 852, 861 (1991). The verdict form, with the jury's answers, appeared as follows:

> What compensatory damages, if any, do you award Ciara?
>
> From Simmon:     $ 1,750,000
>
> From VCAM:      $ 1,750,000
>
> (If you are awarding the <u>same</u> damages to be shared by the two defendants, check here:____)

The same language and answers were repeated as to Brona. The jury's answers to the interrogatories indicate that the jury awarded separate damages against Simmons and VCAM—i.e., that their injuries were divisible—and believed and intended that plaintiffs would recover from defendants severally.

¶ 41. Plaintiffs assert that notwithstanding the jury verdict, they were legally entitled to joint and several liability under Vermont law and the Restatement (Third) of Torts: Apportionment of Liability § 14 (2000), which makes a negligent tortfeasor, who had a duty to protect the plaintiff from the specific risk of an intentional tort, jointly and severally liable for the share of compensatory damages allocated against the intentional tortfeasor. This Court has never addressed the Restatement provision cited by plaintiffs, though it is arguably consistent with "[o]ur traditional rule . . . that multiple tortfeasors are jointly and severally liable." Levine v. Wyeth, 2006 VT 107, ¶ 36, 183 Vt. 76, 944 A.2d 179. Complicating matters is that "several liability has replaced joint and several liability where 12 V.S.A. § 1036 applies." Plante v. Johnson, 152 Vt. 270, 272, 565 A.2d 1346, 1347 (1989). Our case law suggests that § 1036 may not apply where, as here, the plaintiff is not alleged to be contributorily negligent. Id.; Levine, 2006 VT 107, ¶ 38. Further, § 1036(a) provides for apportionment among defendants based on "the ratio of the amount of the defendant's causal negligence to the amount of causal negligence attributed to all defendants." It is unclear that this provision would apply where one defendant is liable for an intentional tort and the other is liable based on negligence-related theory.

¶ 42. Given the apparent uncertainty surrounding whether joint and several liability applied in this situation, and plaintiffs' reliance on a Restatement provision that has not previously been adopted by this Court, the question of apportionment of liability should have been raised with the court before the jury was instructed and given the verdict form above. Having acceded to the form, however, plaintiffs effectively agreed that the jury could award several liability if it chose. Cf. Silva, 156 Vt. at 109, 589 A.2d at 861 (holding defendants waived claim that interrogatories on verdict form did not comply with law by failing to object before jury was discharged); Ulm v. Ford Motor Co., 170 Vt. 281, 294, 750 A.2d 981, 991 (2000) (holding that where defendant failed to timely object to instruction or interrogatories on damages, defendant waived claim that prejudgment interest could not be awarded because jury did not break down types of damages). Under these circumstances, we conclude that plaintiffs waived their claim that VCAM is liable for the damages awarded against Simmon.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 43. **REIBER, C.J., concurring.** The facts in this case are extreme. Plaintiffs alleged, and the jury found, that defendant Simmon abused his position as a professor and Vermont Community Access Media, Inc. (VCAM) instructor and violated plaintiffs' privacy by surreptitiously filming plaintiffs in repeated stages of undress when they were teenagers. Simmon then posted the videos displaying plaintiffs' intimate areas on the internet, causing the illegal and unauthorized videos to be distributed on several pornographic websites and viewed millions of times. The unknowing and unwelcome filming, compounded by widespread dissemination, resulted in "severe and permanent damages." At trial, a medical expert testified that as a result of defendant's actions both plaintiffs suffer from post-traumatic stress disorder (PTSD) and

18

associated symptoms and psychological dysfunction, including panic, hyperarousal[6] with physical symptoms, nightmares and sleep disturbance, intrusive thoughts, avoidance of distressing memories, self-harm, and self-destructive behaviors. The trial court noted that "Simmon's actions . . . were egregious and caused [p]laintiffs significant harm—harm that may follow them all of their lives." This "outrageous invasion" of plaintiffs' privacy was dehumanizing and traumatic. The majority determines that plaintiffs' mental and emotional harm, as well as physical effects arising from that harm, does not establish the "substantial bodily injury or sickness" necessary for recovery of emotional-distress damages in a negligence case. Vincent v. Devries, 2013 VT 34, ¶ 10, 193 Vt. 574, 72 A.3d 886 (quotation omitted). While that is true under current Vermont law, I write separately to underscore the substantial impacts of serious mental and emotional injuries and to draw attention to an unfairness in how these injuries are treated under our tort law.

¶ 44. Vermont's civil justice system is rooted in fairness and the belief that those who are harmed by others deserve to be made whole. Yet when injuries are psychological rather than physical, that fairness is sometimes denied. This is especially true for Vermonters suffering from PTSD[7], a serious mental-health condition that should be fully compensable in tort law.

---

[6] Hyperarousal is an abnormal state of increased responsiveness to stimuli that is marked by various physiological and psychological symptoms. Hyperarousal, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/hyperarousal [https://perma.cc/ZN3E-SLAZ]. It is a primary symptom of PTSD. It occurs when a person's body suddenly kicks into high alert as a result of thinking about their trauma. Even though real danger may not be present, their body acts as if it is, causing lasting stress after a traumatic event. See, e.g., Kerry J. Ressler, et al., Post-Traumatic Stress Disorder: Clinical and Translational Neuroscience from Cells to Circuits, 18 Nature Reviews Neurology 273 (2022) (describing clinical features of PTSD, identifying current treatment approaches, and discussing ways to identify new treatments and interventions).

[7] Stedman's Medical Dictionary defines PTSD as the "development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience." Posttraumatic Stress Disorder (PTSD), Stedman's Medical Dictionary (28th ed. 2005). "[S]ymptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria." Id.

¶ 45.    PTSD is not simply emotional distress.  It is a serious, medically recognized disorder that can disrupt every aspect of a person's life.  From car crashes to assaults to internet postings of intimate photos and videos, Vermonters can develop PTSD as a result of another's actions, yet still face obstacles in court when seeking to recover for their suffering.  The majority outlines the limitations to recovery that exist in our law for this especially harmful injury to a person's well-being.  The majority correctly states our law, but our law has not kept up with our understanding of this harm.

¶ 46.    Science tells us PTSD is real.[8]  It is diagnosed based on established clinical criteria supported by psychiatric evaluations. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders: Text Revision (5th ed. 2022).  The symptoms, such as flashbacks, hypervigilance, emotional detachment, anxiety, and depression, can be debilitating.  See U.S. Dep't of Veterans Affs., Nat'l Ctr. for PTSD, Related Problems (Mar. 26, 2025) https://www.ptsd.va.gov/understand/related/index.asp [https://perma.cc/Y2L3-3CFX ].

¶ 47.    Skeptics may say PTSD is too subjective or easy to fabricate.  But courts already handle emotional-distress claims.  The tools to assess PTSD, including medical records, expert testimony, and guidelines from the Diagnostic and Statistical Manual of Mental Disorders, are well within the competence of judges and juries.  See, e.g., Kaplan v. Hezbollah, 213 F. Supp. 3d 27, 37 (D.D.C. 2016) (relying on medical documentation to corroborate injuries); Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 36-37 (D.D.C. 2018) (relying on formal diagnoses of PTSD in finding defendants liable for intentional infliction of emotional distress); Carter v. United States,

----

    [8]  While research into the mode of action for specific PTSD symptoms, the reasons for differences in type and severity of symptoms between individuals, and the most effective treatment options is ongoing, the causes, defining symptoms, and wide-ranging impacts of PTSD are well-documented.  See U.S. Dep't of Health and Hum. Servs., Nat'l Insts. of Health, Nat'l Inst. of Mental Health, Traumatic Events and Post-Traumatic Stress Disorder (PTSD) (Dec. 2024), https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd [https://perma.cc/ C5P4-DZGZ]; U.S. Dep't of Veterans Affs., PTSD: Nat'l Ctr. for PTSD (May 1, 2025), https://www.ptsd.va.gov/index.asp [https://perma.cc/8RCA-T33C].

760 F. Supp. 2d 281, 283 (E.D.N.Y. 2011) (explaining that "necessary 'guarantee of genuineness' " was supplied by a "formal diagnosis of PTSD made by both parties' medical experts"); Chrz v. Mower Cnty., 986 N.W.2d 481, 487 (Minn. 2023) (relying on evaluation of PTSD by licensed medical professional using Diagnostic and Statistical Manual of Mental Disorders (DSM-5) in determining employee compensation for disablement resulting from occupational disease). We don't deny damages for pain associated with a back injury because it depends on a doctor's opinion. Mental health deserves the same respect.

¶ 48. This Court has previously held that "[t]o accept PTSD as a physical injury simply because it may result in physical changes to one's body would 'break down entirely' the logical divide 'between emotional and physical harms.' " Zeno-Ethridge v. Comcast Corp., 2024 VT 16, ¶ 34 __ Vt. __, 315 A.3d 978 (quoting Bobian v. CSA Czech Airlines, 232 F. Supp. 2d 319, 326 (D.N.J. 2002), aff'd sub nom. Bobian v. Czech Airlines, 93 F. App'x 406, 408 (3d Cir. 2004)). We went on to say that this blurring would render negligent infliction of emotional distress (NIED) and negligence "indistinguishable and pointlessly duplicative." Id. I feel now, as I did in dissent then, that such a rigid conception of what types of harms qualify as a recoverable physical injury ultimately does a disservice to genuinely harmed plaintiffs. See id. ¶¶ 38-49 (Reiber, C.J., dissenting).

¶ 49. Recognizing PTSD as an independent basis for tort recovery would affirm the dignity of trauma survivors and align with Vermont's longstanding commitment to justice. It would ensure that those who have been deeply harmed—not just physically but psychologically—are fully heard and compensated. It would reflect Vermont's values: compassion, fairness, and respect for science. It would ensure that trauma survivors are not left behind simply because their wounds are not always visible to others.

¶ 50. In an era where mental health is finally receiving long-overdue attention, we should take the next step by making it unequivocally clear that PTSD is a legitimate and recoverable injury in tort law. This Court said in Zeno-Ethridge that PTSD alone is "insufficient to satisfy the

'actual injury' requirement of a negligence claim." Id. ¶ 35. But, this case illustrates that such a limitation imposes an actual unfairness on these plaintiffs. For these reasons, although I agree that current Vermont law supports the majority's reasoning, I respectfully encourage development of this aspect of tort law to incorporate our growing understanding of PTSD when we meet the facts of this and similar matters that come before us.

¶ 51.    I am authorized to state that Justice Waples joins this concurrence.

_____

Chief Justice